# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

―――――――――――――――――――――――――――

| | |
|---|---|
| L.S., a minor, by P.S., his parent and next friend, on behalf of himself and all others similarly situated, ) ) ) ) | Case No. 3:10-cv-01372 (CSH) |
| Plaintiff, ) ) | **REDACTED VERSION**<br>**(per Local Civil Rule 5(e)(8)(d))** |
| v. ) ) | **CLASS ACTION COMPLAINT** |
| WEBLOYALTY.COM, INC., AMAZON.COM, INC., and VISA INC., ) ) | <u>**Jury Trial Demanded**</u> |
| Defendants. ) ) | August 27, 2010 |

―――――――――――――――――――――――――――

Plaintiff, L.S., a minor, by P.S., his parent and next friend ("Plaintiff"), individually and on behalf of all others similarly situated, files this Class Action Complaint against Defendants, Webloyalty.Com, Inc. ("Webloyalty"), Amazon.com, Inc. ("Amazon.com"), and Visa Inc. ("Visa"), and alleges based on personal knowledge, information and belief, and the investigation of his counsel, as follows:

## <u>NATURE OF THE CASE</u>

1.     Webloyalty is in the business of deceiving people into signing up and paying fees for no apparent service.  It serves no legitimate commercial purpose.  Webloyalty tricks and exploits consumers, in collusion with respected on-line retailers, by interjecting a pop-up window or message during the sales confirmation process for such on-line retailers, offering consumers a discount off their next purchase.  Consumers are not informed and do not know that the purported offer is being made by a third party to their transaction with the retailers' or that, rather than signing up for a free coupon or discount, they are actually enrolling with Webloyalty for a service Webloyalty and the retailers know the consumer is unlikely to ever use, but for which the

consumer's credit or debit card will be billed monthly.

2.      Retailers, such as Amazon.com, allow Webloyalty to deceive their customers because they contract with Webloyalty to be paid a "bounty" for each such customer deceptively enrolled by Webloyalty.  Those bounties represent 100% profit for retailers like Amazon.com.  Thus, Amazon.com, like other retailers, allows Webloyalty to design its pop-up to appear to be part of the payment phase of customer transactions with Amazon.com.  Amazon.com and other retailers also agree with Webloyalty to perform a "data pass" function or process so that the customer payment information, already input by a customer in the payment phase of the transaction with Amazon.com, will be passed on to Webloyalty without the customer ever re-entering his or her payment information.  This "data pass" process is tremendously deceptive to customers since people purchasing goods and services on-line expect that they will not be billed unless they specifically enter such payment information.  Webloyalty and on-line retailer partners, such as Amazon.com, know that the data pass deceives the retailers' customers, but in pursuit of a pure profit revenue stream, nonetheless allow their customers to be so deceived.

3.      Credit and debit card companies such as Visa are also a part of this deception.  The "data pass" that fuels the deceptive scheme violates the membership agreements through which Visa operates.  Such charges should be declined.  Indeed, the credit and debit card companies' fraud warnings have gone off repeatedly with regard to these transactions, but they process the charges anyway in order to reap the fees derived from such deceptive charges.

## JURISDICTION AND VENUE

4.      The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331.  The Court is further vested with subject matter jurisdiction pursuant to 28 § 1332(d)(2)

2

because this is a class action with damages exceeding $5,000,000 and there are thousands of

members of the proposed Class, who are citizens of States different from Defendants.  This Court

has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

5.      Venue is proper in this District as Webloyalty maintains its principal offices

within this District here, Plaintiff resides within this District and a substantial part of the events

giving rise to this claim occurred here.

## PARTIES

6.      Plaintiff resides in Greenwich, Connecticut and is a citizen of this State.

7.      Webloyalty is a company duly incorporated and existing under the laws of the

State of Delaware.  Webloyalty maintains its principal place of business at 101 Merritt 7, Fourth

Floor, Norwalk, Connecticut.

8.      Amazon.com is a company duly incorporated and existing under the laws of the

State of Delaware.  Amazon maintains its principal place of business at 1200 12th Avenue South,

Suite 1200, Seattle, Washington.  Amazon has sufficient minimum contacts with this District so

that exercising jurisdiction over it would not be unreasonable.

9.      Visa is a corporation duly organized and existing under the laws of the State of

Delaware, with its headquarters located in San Francisco, California.  Visa has sufficient

minimum contacts with this District so that exercising jurisdiction over it would not be

unreasonable.

## CLASS ACTION ALLEGATIONS

10.      Plaintiff brings this action as a class action pursuant to Federal Rule of Civil

Procedure 23, on behalf of all those people or entities whose personal data was accessed by

3

Webloyalty during the period of October 1, 2008 to the date of entry of judgment herein, including all those persons or entities whose data was passed to Webloyalty when making a financial transaction with Amazon.com, as well as all people or entities who were charged a membership fee by Webloyalty for its so-called "Shopper Discounts" membership program when making a financial transaction with Amazon.com.

11.     Members of the proposed Class are so numerous that joinder of all members is impracticable.  The Congressional Commerce Committee Report (described more fully below) notes that the deceptive sales tactics at issue here led to $1.4 billion in total revenue for Affinion, Vertrue, and Webloyalty.  Since the transactions at issue typically resulted in the imposition of a monthly charge of $10 to $20, this vast revenue stream demonstrates a vast multitude of deceived consumers that form the Class in this action.  Indeed, the Commerce Committee Report noted that Affinion, Vertrue, and Webloyalty "have knowingly charged millions of consumers for services the consumers do not use and unaware they have purchased."  While the exact number of Class members is unknown to Plaintiff at this time, and can only be ascertained through appropriate discovery, Plaintiff believes there are at least thousands of members of the Class. Class members can be identified through, among other things, records maintained by Webloyalty, Amazon.com, and Visa and can be notified of the pendency of this action by mail, using a form of notice customarily used in class action litigation commenced in federal district courts.

12.     Plaintiff's claims are typical of the claims of the other Class members, as all of the members of the Class were similarly affected by Defendants' wrongful conduct complained of herein.

13.     Plaintiff will fairly and adequately protect the interests of the members of the

Class and has retained counsel competent and experienced in complex class action litigation.

14.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Questions of law and fact common to all members of the Class include, among others:

(a)    Whether Defendants wrongfully accessed the confidential credit card and debit card information of Plaintiff and the Class;

(b)    Whether Defendants are liable under the Electronic Communications Privacy Act ("ECPA") for accessing, intercepting, and/or transmitting personal and private information of Plaintiff and the Class electronically communciated over the Internet and/or contained on their computers, or using a device to do so;

(c)    Whether Amazon.com is liable under the ECPA for intentionally disclosing to Webloyalty and/or using the electronic communications of Plaintiff and the Class;

(d)    Whether Defendants have violated and continue to violate the ECPA;

(e)    Whether Amazon.com has aided and abetted or conspired with Webloyalty to violate the ECPA, and continues to do so;

(f)    Whether Plaintiff and the Class are entitled to dmaages provided for under 18 U.S.C. § 2520;

(g)    Whether the manner in which Webloyalty routinely and systematically promoted the Shopper Discount product during on-line transactions between consumers and on-line retailers constituted a valid contractual offer as a matter of law to Plaintiff and the Class;

(h)    Whether Webloyalty can establish the acceptance by Plaintiff or the Class of any

5

so-called offer to purchase Webloyalty's Shoppers Discounts membership;

(i)     Whether Webloyalty committed unfair and deceptive acts and practices in charging Plaintiff and the Class for the Shoppers Discounts product, whether Amazon.com committed unfair and deceptive acts and practices in accepting a bounty and other remuneration for customers so enrolled by Webloyalty, and whether these acts and practices violated and continue to violate Connecticut's Unfair Trade Practices Act ("CUTPA");

(j)     Whether Defendants have been unjustly enriched at the expense of Plaintiff and the Class;

(k)     Whether Defendants made negligent misrepresentations and/or omissions of material fact to Plaintiff and the Class;

(l)     Whether Plaintiff and the Class relied on Defendants' negligent misrepresentations and/or omissions of material fact;

(m)    Whether Plaintiff and the Class were damaged by Defendants' negligent misrepresentations and/or omissions of material fact and, if so, in what amount;

(n)     Whether Defendants made fraudulent misrepresentations and/or omissions of material fact to Plaintiff and the Class;

(o)     Whether Plaintiff and the Class relied on Defendants' fraudulent misrepresentations and/or omissions of material fact;

(p)     Whether Plaintiff and the Class were damaged by Defendants' fraudulent misrepresentations and/or omissions of material fact and, if so, in what amount;

(q)     Whether Defendants violated the Electronic Funds Transfer Act ("EFTA");

(r)     Whether Plaintiff and the Class were damaged by Defendants' violations of the

         EFTA;

(s)     Whether Visa aided and abetted the violations of law of Webloyalty and

         Amazon.com;

(t)     Whether Plaintiff and the Class were damaged by Visa's aiding and abetting of

         Webloyalty's and Amazon.com's violations of law and, if so, in what amount; and

(u)     Whether Plaintiff and the Class are entitled to injunctive and/or declaratory relief.

15.     Plaintiff will fairly and adequately protect the interests of the Class.

16.     Plaintiff has retained counsel experienced in class and complex securities

litigation, and will, along with his counsel, vigorously prosecute this action.

17.     A class action is superior to other available methods for the fair and efficient

adjudication of this controversy.

18.     Plaintiff sees no difficulty in managing this action as a class action.

## STATEMENT OF FACTS

19.     Webloyalty gains access to on-line consumers by entering into financial

agreements with reputable on-line websites and retailers.  In exchange for "bounties" and other

payments, reputable on-line retailers, such as Amazon.com, agree to allow Webloyalty to sell

purported club memberships to consumers as the consumers are in the process of completing an

on-line purchase with the retailers.  The sales tactics used by Webloyalty are designed to trick

consumers to sign up for services they do not want and do not even know that they purchased.

Plaintiff is one such consumer so tricked by Webloyalty and its "partner," Amazon.com.

20.     With the cooperation of on-line "partners," such as Amazon.com, Webloyalty

7

inserts a pop-up sales offer into the "post-transaction" phase for on-line purchases, *i.e.*, after an Amazon.com customer has made a purchase but before he or she have confirmed or completed the sale transaction. Such offers typically promise a cash back reward and are designed by Webloyalty to appear to be related to the transaction the consumer is in the process of completing. The sales offer contains misleading "yes" or "continue" buttons, causing consumers to reasonably believe that they are completing the original transaction, rather than entering into a new, ongoing financial relationship with a membership club operated by Webloyalty and entirely separate from Amazon.com.

21.     Similarly, if not more, misleading is the "data pass" process Webloyalty and Amazon.com use to automatically transfer the consumer's credit or debit card information from Amazon.com to Webloyalty. Passing consumers' billing information directly to Webloyalty, without requiring consumers to re-enter that information, deprives consumers of fair notice that they are entering a new, ongoing financial relationship with Webloyalty, a third party to the transaction between the consumer and Amazon.com.

22.     Plaintiff herein was one of the thousands of consumers tricked into enrolling with Webloyalty for its non-existent services. In connection with the completion of an on-line transaction with Amazon.com in or around late November, 2009, Plaintiff was entirely unaware that he had enrolled with Webloyalty for any purported service, until thereafter being charged $12.00 per month over the course of five months by "Shopper Discounts," a company of which Plaintiff had never heard. But for being deceived into somehow enrolling in Shopper Discounts, Plaintiff would not have enrolled.

23.     Plaintiff was entirely unaware that he was enrolling in any service offered by

8

Webloyalty or its affiliate, Shopper Discounts, did not intend to enroll in any service offered by Webloyalty or Shopper Discounts, and remains unaware of any service actually offered by Webloyalty or Shopper Discounts.

24.     Plaintiff would not have enrolled for any service offered by Webloyalty or Shopper Discounts had he not been tricked into doing so.

25.     To his knowledge, Plaintiff has never availed himself of any service offered by Webloyalty or Shopper Discounts, to the extent those companies offer any actual services.

26.     Plaintiff did not intend for Amazon.com to pass his debit card and other personal information to Webloyalty and did not consent to Amazon.com passing his debit card and other personal information to Webloyalty.

27.     Indeed, in May 2009, the United States Senate Committee on Commerce, Science, and Transportation (the "Commerce Committee") opened an investigation into the practices of Webloyalty, among others, "because thousands of online consumers have complained to state attorneys general, the Better Business Bureau, and other consumer advocates that the enrollment process ... is misleading and deceptive."  Just as Plaintiff herein, those consumers complained that "they did not consent to sharing their billing information with a third party membership club."  Also, just as with Plaintiff herein, "they also say they only learned they had been enrolled in one of these membership clubs after seeing a 'mystery charge' on their monthly credit card or checking account statement months after the purchase."

28.     The Commerce Committee collected and reviewed thousands of pages of documents produced by Webloyalty and others; interviewed dozens of Internet customers who complained about unknowingly and inadvertently enrolling in the programs offered by

9

Webloyalty and other companies; interviewed employees of on-line retailers currently and formerly in partnership with Webloyalty and others; and met with numerous internet and "e-commerce" experts.

29.     The internal Webloyalty documents reviewed by the Commerce Committee staff showed that Webloyalty knows that most of the "members" it acquires through its aggressive on-line sales tactics do not understand, just as Plaintiff did not understand, that they have been enrolled in a program that charges their credit or debit card on a recurring basis.  Most of those tricked into enrolling in a Webloyalty "membership," as reported by the Commerce Committee, "never receive any benefit from their club membership."  Indeed, the Commerce Committee noted a Webloyalty employee's candid e-mail admission that "at least 90% of our members don't know anything about the membership" and that, as another Webloyalty employee acknowledged in an e-mail, most of the calls received by Webloyalty were "from members who are questioning charges or want to cancel their membership."

30.     Companies like Amazon.com that partner with Webloyalty know, by virtue of their "bounty" agreements, that more aggressive sales tactics lead to higher revenue.  The "customer noise" – customers complaining to Webloyalty's partners, using words like "fraud," "tricked," "deceptive," "misleading," and/or "scam" – has led a number of Webloyalty's partners to request a more "conservative" approach or to end their relationships with Webloyalty.  Unfortunately, Amazon.com's partnership continues to trick, mislead, and defraud Amazon.com's customers.

31.     Such partnerships between Webloyalty and e-commerce retailers are entered into contractually, with Webloyalty agreeing to share a portion of its revenues with its partners.

10

These agreements typically give partners a financial incentive to expose their customers to Webloyalty's aggressive third-party offers.  Payments made to Amazon.com and other Webloyalty partners are called "bounties."  This payment system (also known as Cost Per Acquisition or "CPA") provides a straightforward incentive to the retailer to use more aggressive sales tactics.  Every consumer "join" means an additional bounty payment.  Payment terms in such contracts are often tied to a statistic known as the "conversion rate," which measures the success of the enrollment offers by comparing the total number of customers who view the offer to the subset who actually enroll in the club.

32.     For the payment of bounties, Amazon.com allows its customers to be deceived during the post-transaction phase of their transactions, by permitting them to be unknowingly enrolled in Webloyalty club memberships that provide no tangible service to the Amazon.com customers, but for which they will be charged.  The revenue earned by Amazon.com through its partnership with Webloyalty has no associated costs and is 100% profit.

33.     In order to maximize the revenue derived from tricking consumers into enrolling in Webloyalty club memberships, the data pass plays a crucial role.  As demonstrated by a Webloyalty internal document analyzing and tracking conversion rates, which was provided to the Commerce Committee, consumers are about four times more likely to join Webloyalty's membership clubs if their debit or credit card data is automatically transferred from the retailer.

34.     Since the "data pass" leads to a massive increase in the number of consumers deceived by Webloyalty's marketing methods through the access provided by its partners, such as Amazon.com, Webloyalty pushes the use of data pass on its partners.  Indeed, in a presentation to one such partner, Webloyalty bluntly stated that requiring the consumer to re-enter credit card

information would severely diminish the revenue stream, as less consumers would be tricked into enrolling. This document noted that "with data collection on the page [y]ou can expect at least a 70% decrease in conversion."

35.     With regard to Webloyalty's deceptive marketing methods, the Commerce Committee noted that a prominent feature of the post-transaction offer, such as the one that deceived Plaintiff herein, is up-front gifts, such as "$10 Cash Back on Your Next Purchase!," which is presented to consumers as if it is related to the websites where they have just made their purchases. Companies such as Webloyalty use pop ups – windows that appear on top of, but do not totally conceal, the consumer's confirmation page. These pages look very similar to the enrollment offers presented via "interstitial" pages, but they do not require the customer to accept or reject the offer in order to proceed to the confirmation page. Such companies sometimes employ a hyperlink to an enrollment offer ("banner") on the confirmation page, which can be accessed via clicking a button labeled "continue." The Commerce Committee found that a "Continue" button is used despite the fact that the customer has completed the transaction at this point.

36.     The Commerce Committee also found that the "data pass" was a central element to Webloyalty's trickery. "Instead of requiring the consumer to enter this billing information a second time to confirm acceptance of this new offer, the retailer will pass the consumer's credit card and billing information to the third party once the consumer has provided information the third party company regards as 'proof of enrollment,' such as an e-mail address."

37.     The Commerce Committee also discussed marketing schemes such as the "free-to-pay" conversion, which enrolls consumers in a membership program for free for a period of

time before their credit card or checking account is charged.  This practice, also employed by

Webloyalty, is particularly deceptive in light of the "data pass" since consumers, such as

Plaintiff, do not understand that the marketers already have their billing information and are

deceived into thinking that they must take some action before they will be charged.

38.      The Commerce Committee concluded, based on its detailed investigation, that

Webloyalty knows that the "data pass" and other aggressive on-line sales tactics it employs in

conjunction with its partners drive up the rate of consumer "joins" to their membership

programs.  It also knows that most of the consumers who "enroll" in its membership clubs

through these aggressive tactics do so unknowingly and inadvertently, as did Plaintiff herein.

39.      Internal Webloyalty documents reviewed by the Commerce Committee indicate

that it receives an overwhelming amount of negative feedback from consumers once they learn

they are paying "members" of clubs they have never heard of and whose services they have never

used.  Indeed, Webloyalty's "customer service" operations are almost entirely dedicated to

handling the large volume of calls from confused and angry consumers requesting cancellations,

and asking how the company ever obtained their credit card information.

40.      The Commerce Committee noted that "given that most 'members' are unaware

they were enrolled in the programs, information provided by ... Webloyalty not surprisingly

shows that most 'members' cancel their membership once they realize they are being charged on

a monthly basis.  It also shows that a very large percentage of the members never utilize the

purported benefits of the programs or even take the simple step of logging into the companies'

websites to access the benefits they are paying for each month."  According to information

provided to the Commerce Committee by Webloyalty and two other similar companies, of the

34,262,674 members who were promised automatic cash gifts or other incentives, only 3%
actually received the promised enrollment benefit.

41.     Information Webloyalty provided to the Commerce Committee included a
February 28, 2005 document titled "Product Usage Statistics," which appears to show that the
rate of benefit usage for members enrolled through the data pass process ranged between 0.2%
and 11.4% for a six month period between 2004 and 2005.  A "Site Usage" table presented to the
Webloyalty Board of Directors in March, 2006 reported that between 70% and 80% of
Reservation Rewards club members enrolled through the data pass process had either never
visited the Reservation Rewards site at all or viewed only the club's home page without ever
accessing additional pages.  An expert who testified before the Commerce Committee, Professor
Benjamin Edelman, notes that while Webloyalty claims to have more than two million paying
club members, none of the it's club web pages rank among the Internet's top 100,000 sites for
web traffic.  Professor Edelman concluded that "this gap between signups and users confirms that
Webloyalty's marketing failed to obtain meaningful consent from the users who purportedly
'accepted' Webloyalty's offer."

42.     Internal data and member surveys commissioned by Webloyalty clearly show that
Webloyalty understands that the majority of their paying "members" have little or no awareness
of their financial relationship with Webloyalty.  Internal data tracked by Webloyalty shows that it
has known for years that the majority of its members were unknowingly enrolling in the
membership clubs it offered.  A "Disposition Report" run, dated September 1, 2003, appears to
show that, of the 66,922 members who cancelled their Reservation Rewards membership in
August, 2003, 51,560, or 77%, had indicated "Did Not Authorize/Was Not Aware" as their

reason for cancellation.  "Disposition Reports" run in the following years showed similar trends

and, in 2008, a Webloyalty call center employee, while participating in a discussion about

proposed call center script changes, acknowledged in an e-mail message that "[a]t least 90% of

our members don't know anything about the membership."

43.    Customer surveys commissioned by Webloyalty and e-commerce and internet

retail partners in 2004 and 2006 further confirm that most of Webloyalty's members were

unaware they had enrolled in Webloyalty's membership clubs.  As part of one such survey, 308

past or current members of Reservation Rewards – half of whom were described as "active"

members – were asked a series of questions; 234 such members (76%) either did not recall being

offered a Reservation Rewards membership or said they had declined a membership offer.  Only

62 of the members (20%) remembered receiving an e-mail notifying them of their Reservation

Rewards membership.  Only 5 members (1.6%) said they had received a $10 cash back offer.

Only 4 members (1.3%) said they had used Reservation Rewards discounts.

44.    A "Quick Reference Guide" distributed to Webloyalty employees explained that it

was important to ask members why they were canceling their membership for Travel Values

Plus, a membership program offered by Webloyalty.  It stated, "[m]any times the reason is that

they had no idea what Travel Plus was and you will then have the opportunity to explain."

Another page in a Webloyalty manual offered a list of the "Top Ten Reasons a Member Calls"

and offered "Cancel my membership" and "What is this charge?" as the top two reasons.  Other

Webloyalty manuals provided call center representatives with a process for handling members

asking the questions: "what is this charge?" or "who are you?"

45.    The Commerce Committee found that there is "abundant evidence that the e-

commerce partners are aware that their customers are being misled by the enrollment offers from ... Webloyalty."  When such e-commerce partners enter into their partnerships with Webloyalty, Webloyalty promises to handle cancellations, complaints, and other "customer service" issues. Pursuant to this arrangement, when consumers see a membership club charge, they are provided only a club name and a toll-free number operated by Webloyalty, just as has happened with Plaintiff here.  The purpose of routing customer service issues through Webloyalty is to prevent what Webloyalty's promotional materials refer to as "negative impact on partner brands." Webloyalty handles the calls and complaints from deceived customers in an obvious attempt to insulate the partners from their own customers' criticism, which is commonly described as "customer noise."

46.    In August, 2003, Webloyalty's Senior Vice President for Business Development and Account Management sent an e-mail summarizing partners' concerns to senior Webloyalty executives, including Rick Fernandes, the Chief Executive Officer, stating:

What clients tell us...
1.    Pre-bill notification is buried in pre-bill e-mail.  Make it more upfront.
2.    Special reward is perceived as misleading.  It's not a reward it's an obligation.  Test special offer.
4.    [sic] The segue "Congratulations, Thank you for your purchase" is misleading.  Sounds like it's a thank you from client and it's not, it's an offer from WL [Webloyalty].
5.    Continue button is misleading – customer does not have to continue.
6.    Yes button is misleading, should say enroll, sign up, etc.
7.    Language about data pass is buried.  Customers are unaware their data is being passed.
8.    Trial and price point is buried – it's clear you get 30 days free, but not clear you'll be automatically renewed if you don't cancel.  And then the fee is buried too.

47.    In April, 2004, the employee of a Webloyalty e-commerce partner, which operated

16

a virtual shopping cart for Internet merchants, sent an e-mail to a Webloyalty employee stating:

> ...I do keep hearing the same thing from our merchants who are calling up wanting the program removed.  They are telling us their shoppers are saying:
> 1)     They have been tricked into buying and or signing up for something
> 2)     They did not know there was a cost involved with the program
> 3)     The cost was hidden at the bottom of the page, or not very clear
> 4)     They do not know who to call to get more info, so they call the merchant (who gets ticked off, calls us and wants out of the program).
> 5)     They do not know who is offering the program or who to contact so again they call the merchant (who gets ticked off, calls us and wants out of the program).

48.     In a January, 2006 e-mail, Webloyalty employees discussed concerns that an e-retailer partner had raised, stating:

> He mentioned that they are getting a lot of noise with our program and that people are writing blogs about ... what a scam WLI RR [Webloyalty Reservation Rewards] is ... He's very concerned ...  Bottom line is he wants to test more conservative pages against the control to find a page that's more clear and see what it does to his financials.

49.     In January, 2007, another e-retailer that had partnered with Webloyalty sent an e-mail to Webloyalty, stating that, "...we have had regular complaints from our customers...[w]e simply cannot have complaints such as this."  He went on to note that, "The particularly cheerless concern is that to generate more revenue through Webloyalty, it seems we must be more aggressive (and deceptive) in our marketing techniques."

50.     In March, 2007, an employee for yet another e-retailer who had partnered with Webloyalty sent an e-mail expressing concerns about complaints.  He stated, "We are getting an unbelievable number of complaints on our current set-up.  Customers (ours are older) are feeling tricked and many state they are not coming back to our sites because of it.  Don't know if that is true, but I still want to talk about it."

51.     In February, 2008, another e-retailer expressed concerns to Webloyalty in an e-mail:

> We're all still very concerned about the negative impact we are experiencing to
> our reputation online.  And, we continue to get enough angry callers that our call
> center manager ... has to personally field about 3 of the angriest callers a week.
> (We estimate that if [our call center manager] is getting 3 our call center is getting
> 15 and your team is probably getting 75 or more per week)...  Webloyalty has
> been unwilling to share with us any data that would help us to understand how our
> customers are using the program – or whether they are...   To be quite candid...we
> don't have a clue how our customers feel about this program.

Two months later, the e-retailer informed Webloyalty that "we have decided to part ways because as time went by it became clear to us that our customers don't want this program."

52.     Robert J. Meyer, the Gayfryd Steinberg Professor of Marketing at The Wharton School of the University of Pennsylvania, submitted testimony to the Commerce Committee in which he analyzed the actions of Webloyalty and other similar companies and consumers' experience with those companies, finding:

> My overall assessment of these web schemes is straightforward: they represent an
> enterprise whose primary purpose is to foster and exploit weaknesses in consumer
> decision making in an effort to con consumers into purchasing memberships that
> hold limited value and without their fully informed consent.  The combination of
> the sellers' perceived need to use deceptive selling tactics and the low rate of
> utilization of the benefits supposedly provided by their programs implies they did
> not believe they were marketing a good or service that held value for consumers.
> As such, the operation cannot be defined as either a legitimate marketing
> operation or a legitimate consumer business.

53.     Prentiss Cox, Associate Professor of Clinical Law at the University of Minnesota Law School, also testified before the Commerce Committee.  Professor Cox found that the type of pre-acquired account marketing being employed by Webloyalty creates "massive consumer confusion and extraordinary numbers of consumer complaints about unauthorized charges to

financial accounts." Such marketing is designed to identify "vulnerable and distracted consumers unaware that their accounts have been charged." In conclusion, Professor Cox found:

> Preacquired account marketing has no legitimate commercial reason to exist yet drains the wealth of consumers who are unaware their accounts are being charged. Consumers are exposed to these charges for unwanted services when e-tailers, other retailers and financial institutions sell special access to their customers' accounts in return for a share of the gain.

54.     Florence Marotta-Wurgler, Associate Professor at New York University School of Law, also provided testimony to the Commerce Committee. Professor Marotta-Wurgler found that the "norm of online commerce" is a "multi-step checkout process that requires entering a preferred payment method as well as shipping and billing addresses." The marketing techniques employed by Webloyalty, however, "interfere with these established norms, creating consumer confusion in a way that would appear deceptive." Professor Marotta-Wurgler found that such confusion is exacerbated by the use of a format for the post-transaction marketer's offer that is deceptively similar to that one used by the originally selected vendor (*i.e.*, Amazon.com here). Moreover, given the phraseology often employed by post-transaction marketers, *e.g.*, "Congratulations," "Thank You," and "Member Rewards," and consumers' "expectations that financial liability is incurred only after entering a payment method, it seems unlikely that barely noticeable disclosures will correct consumers' misperceptions." In conclusion, Professor Marotta-Wurgler found "because post-transaction marketers present themselves to consumers in an unexpected fashion at an unexpected juncture of the transaction, they violate the norms of online commerce and should be held to a higher standard of disclosure and transparency."

55.     On May 19, 2010, the Commerce Committee issued its "Supplemental Report on Aggressive Sales Tactics on the Internet" (the "Supplemental Report"). The Supplemental

19

Report focused on the experience of millions of consumers after they were enrolled in

membership clubs "as a result of the deceptive sales tactics employed by ... Webloyalty, and [its]

online partners."  The Supplemental Report details the basic two-step business model followed

by Webloyalty:

"1) use deceptive sales tactics to charge consumers' credit and debit card accounts, and 2) after

consumers discover the unauthorized charges, refund as little of their money as possible."

     56.    The Supplemental Report confirmed, through further evidence submitted to the

Commerce Committee, the deceptive practices engaged in by Webloyalty and its on-line partners,

such as Amazon.com.  It further noted that the "bill descriptors" for the "mysterious fees"

charged by Webloyalty "provided little useful information to consumers about the source of these

charges."  Like the bill descriptor provided to Plaintiff, only a toll-free number is provided and,

again like Plaintiff's situation, it generally took consumers at least several months to discover

these "all but invisible" charges.  As a result, Webloyalty "collected multiple monthly fees" from

Plaintiff and other "consumers who had never consented to them."

     57.    The Commerce Committee found that Webloyalty's business plan was to

    improperly charge consumers' credit cards for services the companies knew
    consumers did not intend to purchase and were not using, and then refund as small
    a portion of this money as possible after consumers discovered the charges.  The
    less money these companies refunded, the more profits they earned.  Documents
    reviewed by [the Commerce] Committee staff reveal the sophisticated policies
    and procedures ... Webloyalty set up to minimize the amount of improper charges
    they refunded to the millions of confused and angry consumers who contacted
    them each year.

     58.    Webloyalty's internal protocols required customer service representatives to offer

the "stop bill" script – a prepared statement or dialogue offering to end billing the deceived

consumer without providing any refund for prior billings – to all consumers, even those who called and immediately requested refunds. Webloyalty employees who mentioned refunds before offering merely to stop billing were given poor evaluations by their supervisors. One Webloyalty customer service representative, who received the lowest possible score of "0" on a call from his supervisor, was told: "What you did on that call was start to use the stop bill script and then decide[d] on your own not to use it and just give the member the money back." After receiving an internal e-mail encouraging customer service representatives to listen carefully to their customers, a Webloyalty phone representative replied: "Unfortunately if I listen too well I get a zero for not using the stop bill script. I have been told we need to ignore what they say and use the stop bill script."

59. When deceived consumers refuse to merely accept the cancellation of the program they were unwittingly enrolled in, they enter a so-called "escalation" process in which Webloyalty representatives individually negotiate refunds with these more persistent consumers. "The goal in this process was to refund as little money as possible." Webloyalty representatives were instructed to first offer a one-month refund and then a two-month refund. If the consumer insisted on a refund going back further than two months, Webloyalty required the consumers to fill out and send back an affidavit. The requirement of a written affidavit for larger refunds was imposed by Webloyalty because it knew a substantial portion of consumers would neglect to submit the paperwork. In a 2008 survey of cancelled memberships, Webloyalty found that fewer than half of the consumers who had been sent "Additional Refund Request" forms had returned them.

60. The Supplemental Report delved into the role of credit card companies and banks

in the post-transaction sales industry. Webloyalty and its retail partners, such as Amazon.com, depend upon the credit and debit card payment systems operated by Visa, MasterCard and American Express to conduct business. Each of these credit card networks has an extensive set of rules about how merchants must conduct themselves when accepting Visa, MasterCard or American Express transactions. Each of the credit card networks also has a fraud monitoring program aimed at identifying and preventing fraudulent merchants from accepting Visa, MasterCard or American Express transactions.

61.     Evidence reviewed by the Commerce Committee from Visa, MasterCard and American Express shows that the data pass process and other practices employed by Webloyalty and its e-commerce and internet retail partners, such as Amazon.com, violate the credit card companies' own operating rules and generated high volumes of customer complaints. Webloyalty has triggered fraud warning or fraud monitoring procedures within Visa, MasterCard and American Express. Despite the significant evidence that Webloyalty's business practices did not meet the credit card systems' standards, Webloyalty maintained its access to the credit card systems and processed millions of questionable credit and debit charges through these systems every month. The Commerce Committee found that, because Webloyalty was able to contain the volume of consumer complaints and "because the credit card companies did not vigorously enforce their own rules," the three companies under investigation, including Webloyalty "were able to charge millions of consumers monthly fees that the consumers had not authorized."

62.     The Commerce Committee also noted in the Supplemental Report that Visa, MasterCard and American Express have long-established rules for merchants who accept their credit cards. They have even more specific rules for merchants who charge consumers' credit

cards through "card-not-present" transactions, which are transactions, such as those conducted

via the internet, in which the merchant does not physically handle the credit card.  "In response to

[Commerce] Committee requests for information about these rules, MasterCard and Visa

acknowledged that the practices of Webloyalty violated a number of their general rules for

merchants or their specific rules for card-not-present transactions."

63.     Visa informed the Commerce Committee that Webloyalty failed to comply with

four different Visa U.S.A. Operating Regulations that require adequate disclosure to cardholders.

Following receipt of the Commerce Committee's December 8, 2009 letter, Visa notified

Webloyalty's acquiring banks that they "will be subject to fines" if they fail to remedy the

violations.  In April, 2010, Visa finalized a rule that clearly prohibits the marketing practices that

Webloyalty had employed.

64.     According to information submitted to the Commerce Committee, between 2006

and 2008, Visa, MasterCard and American Express processed more than 1.4 million chargeback

requests from consumers who claimed they had not authorized the three companies under

investigation by the Commerce Committee, including Webloyalty, to charge their credit or debit

cards.

65.     Ultimately, the Commerce Committee concluded:

Once they had acquired consumers' billing information and deceptively "enrolled"
consumers in their "negative option" membership clubs, Affinion, Vertrue, and
Webloyalty made money as long as consumers took no action.  The three
companies charged consumers month after month for services that consumers did
not use and did not understand they had purchased.  When consumers finally
realized that the three companies were charging them, Affinion, Vertrue, and
Webloyalty withheld important information about the charges from consumers
and made it as difficult as possible for consumers to get their money back.  This
abusive "post-transaction" sales industry was able to flourish because reputable

23

websites were willing to share their customers' billing information with Affinion, Vertrue, and Webloyalty, and because the credit card systems processed millions of the three companies' unauthorized charges.

## CAUSES OF ACTION

## COUNT I

**Violation of Title I of the Electronic Communications Privacy Act Against Webloyalty**

66.     Plaintiff repeats and realleges the allegations contained in each of the preceding paragraphs as if fully set forth herein.

67.     Communications of Plaintiff and the Class with Amazon.com and other web retailers were "electronic communications" affecting interstate commerce within the meaning of 18 U.S.C. § 2510.

68.     Defendant Webloyalty, either directly or by aiding and abetting or through a conspiracy, has intentionally intercepted and/or procured by interception the electronic communications of Plaintiff and the Class without knowledge, authorization, or consent of Plaintiff and the Class in violation of 18 U.S.C. § 2511.  Defendant Webloyalty has intentionally used and/or procured to be used a device to intercept electronic communications of Plaintiff and the Class.  Defendant Webloyalty has intentionally disclosed to another person and/or used the contents of Plaintiff's and the Class's electronic communications.

69.     Webloyalty's interception, procuring to be intercepted, and/or using or disclosing Plaintiff's and the Class's electronic communications without their knowledge or consent was willful and intentional and was committed for the purpose of engaging in the tortious deceptive behavior described herein.

70.     Pursuant to 18 U.S.C. § 2250, Plaintiff and each Class Member are entitled to

preliminary, equitable, and declaratory relief, statutory damages of the greater of $40,000 or $100

a day for each day of violation, actual and punitive damages, reasonable attorneys' fees and costs,

plus any profits made by Webloyalty as a result of such violations.

71.     Plaintiff has retained the undersigned attorneys as counsel who are entitled to a

reasonable fee upon prevailing pursuant to 18 U.S.C. § 2250(b)(3).

## COUNT II

### For Violation of the Electronic Funds Transfer Act Against Webloyalty

72.     Plaintiff repeats and realleges the allegations contained in each of the preceding

paragraphs as if fully set forth herein.

73.     Plaintiff and the Class maintained an "account" within the meaning of 15 U.S.C. §

1693a(2).

74.     Plaintiff and the Class are "consumers" within the meaning of 15 U.S.C. §

1693a(5).

75.     Webloyalty engaged in "unauthorized electronic funds transfers," within the

meaning of 15 U.S.C. § 1693a(11), by debiting the accounts of Plaintiff and the Class without

their knowledge, consent or permission.

76.     Pursuant to 15 U.S.C. § 1693m, Plaintiff and the Class seek damages, statutory

damages, costs and expenses, including reasonable attorneys' fees.

## COUNT III

### For Unjust Enrichment Against Webloyalty and Amazon.com

77.     Plaintiff repeats and realleges the allegations contained in each of the preceding

paragraphs as if fully set forth herein.

25

78.     Webloyalty has accessed and received payments from the credit and debit card accounts of Plaintiff and the Class without authorization and thus knowingly received a benefit from Plaintiff and the Class.

79.     Amazon.com has received "bounties" and other payments from Webloyalty for providing the personal and private information of Plaintiff and the Class to Webloyalty, which Webloyalty uses to charge its illegal Shopper Discounts and other membership clubs' fees and, thus, has knowingly received a benefit from Plaintiff and the Class.

80.     Webloyalty has no valid or legal basis to access and charge the credit and debit cards of Plaintiff and each member of the Class for fees associated with its membership programs, including Shopper Discounts.

81.     Amazon.com has no valid or legal basis to accept payments from Webloyalty, which are actually payments from Plaintiff and the Class, for accessing and charging the credit and debit cards of Plaintiff and the members of the Class.

82.     Webloyalty has received, and continues to receive, substantial fees by charging the credit and debit card accounts of Plaintiff and the Class and/or using the personal and credit and debit information of Plaintiff and the members of the Class to earn money for itself.

83.     Amazon.com receives substantial fees from Webloyalty as a result of Webloyalty's practice of charging the credit and debit card accounts of Plaintiff and the members of the Class and/or using the personal and credit and debit information of Plaintiff and members of the Class to earn money for itself.

84.     Such fees, compensation, and/or profits constitute unjust enrichment for Webloyalty and Amazon.com and should be given back to Plaintiff and the Class with interest.

26

85.     As a direct and proximate result of Defendants' unjust enrichment, Plaintiff and the Class have suffered injury and are entitled to reimbursement, restitution, and disgorgement from Webloyalty and Amazon.com of the benefits unjustly conferred upon them by Plaintiff and the Class.

86.     Plaintiff and the Class have no adequate remedy at law.

## COUNT IV

### For Civil Theft Against Webloyalty and Amazon.com

87.     Plaintiff repeats and realleges the allegations contained in each of the preceding paragraphs as if fully set forth herein.

88.     This claim is brought pursuant to Connecticut General Statutes § 52-564, which provides that: "Any person who steals any property of another, or knowingly receives and conceals stolen property, shall pay the owner treble damages."

89.     Pursuant to Connecticut General Statues § 53a-119(2): "Any person obtains property by false pretenses when, by any false pretense, he obtains from another any property with intent to defraud him or any other person."

90.     Webloyalty and Amazon.com explicitly or implicitly made false representations and statements of existing fact by being silent and omitting to disclose to Plaintiff and the Class the following material facts, among others, which Webloyalty and Amazon.com made with the intent to deceive Plaintiff and the Class: (a) that, by clicking on a pop-up window or advertisement designed by Webloyalty while completing a transaction with Amazon.com and other on-line retailers, the billing information of Plaintiff and members of the Class would be automatically transmitted by Amazon.com and other on-line retailers to Webloyalty, or would be

made available for Webloyalty to intercept; (b) that Webloyalty would automatically charge Plaintiff and the Class a monthly fee for Webloyalty's membership programs, including the Shopper Discounts program; (c) that Webloyalty's Shopper Discounts program provides no benefit to Plaintiff and the Class; and (d) that Amazon.com obtains a bounty and other payments as a result of Plaintiff and the Class having been deceived by Webloyalty.

91.     Plaintiff and the Class relied on the intentional false statements/omissions of material fact by Webloyalty and Amazon.com in completing their transactions.

92.     The false statements/omissions of material fact by Webloyalty and Amazon.com were not made innocently or inadvertently, but were instead made with the intent to obtain money from Plaintiff and the Class by false pretenses.

93.     Webloyalty and Amazon.com's silence and omissions as to the material facts were material insofar as such silence and omissions caused the Plaintiff and the Class to, without their knowledge, enable Defendants to defraud them out of up to $12.00 per month.

94.     Webloyalty and Amazon.com knew that their actions would result in the theft of money from Plaintiff and the Class.  Indeed, evidence reviewed by the Commerce Committee demonstrated, and the Commerce Committee concluded, that Webloyalty and its on-line retailer partners, such as Amazon.com, know that consumers, such as Plaintiff and the Class, are deceived into enrolling into Webloyalty's programs, such as Shopper Discounts, and that absent such deception they would not enroll in any such programs or authorize their credit cards or debit cards to be used for such enrollment.

95.     Webloyalty and Amazon.com intended to, and did, defraud Plaintiff and the Class.

96.     Plaintiff and the Class were fraudulently induced to click on Webloyalty's pop-up

window and were injured thereby.

97.     Webloyalty and Amazon.com obtained money from Plaintiff and the Class as a direct and proximate cause of Defendants' fraud by false pretenses, and Plaintiff and the Class have not been compensated for the payment of such money.

## COUNT V

### For Money Had And Received Against Webloyalty and Amazon.com

98.     Plaintiff repeats and realleges the allegations contained in each of the preceding paragraphs as if fully set forth herein.

99.     Webloyalty and Amazon.com improperly received monies from Plaintiff and the Class they were not legally entitled to receive.

100.    Plaintiff and the Class have a claim for improperly paid fees for enrolling with Webloyalty's clubs, including Shopper Discounts.

101.    Equity and good conscience require that Webloyalty and Amazon.com pay such monies to Plaintiff and the Class.

102.    As a direct and proximate result of Webloyalty's and Amazon.com's improper practices, Plaintiff and the Class have suffered injury and are entitled to reimbursement, restitution and disgorgement in the amount necessary to restore them to the position they would have been in if Webloyalty and Amazon.com had not improperly collected and retained such fees.

## COUNT VI

### For Negligent Misrepresentation Against Webloyalty and Amazon.com

103.    Plaintiff repeats and realleges the allegations contained in each of the preceding

29

paragraphs as if fully set forth herein.

104.    Webloyalty, pursuant to an agreement with Amazon.com, posted an advertisement that would pop-up while Plaintiff and the Class were in the process of completing a financial transaction with Amazon.com.  That pop-up advertisement was designed to appear to be part of the transaction completion process with Amazon.com, though both Webloyalty and Amazon.com knew it was not, and was intended to deceive Amazon.com customers into enrolling into Webloyalty membership programs, such as Shopper Discounts, and causing those customers to incur an unexpected and unwanted charge for a service of which they were unaware and did not intend to enroll.  Moreover, the pop-up advertisement itself was deceptive and hid the terms and conditions upon which the customer would be enrolled in the Webloyalty program.  Plaintiff and the Class were deceived by the conduct of Webloyalty and Amazon.com.

105.    Webloyalty and Amazon.com's conduct resulted in Plaintiff and the Class being assessed unauthorized charges to their credit and debit cards for a purported service that they never requested, would not have requested, and which was not provided.

106.    Plaintiff and the Class were not aware that Webloyalty and Amazon.com's representations were false and were not aware of the omitted and concealed facts.  Plaintiff and the Class relied upon Webloyalty and Amazon.com's misrepresentations and omissions and were damaged thereby.  Had Plaintiff and the Class known the truth, they would not have enrolled in Webloyalty's programs, such as Shopper Discounts.  Plaintiff and the Class have been damaged by Webloyalty and Amazon.com's negligent misrepresentations in an amount to be proven at trial.

## COUNT VII

### For Fraud Against Webloyalty and Amazon.com

107.    Plaintiff repeats and realleges the allegations contained in each of the preceding paragraphs as if fully set forth herein.

108.    Webloyalty and Amazon.com know that Webloyalty's pop-up advertising on the Amazon.com website is designed to appear as part of Amazon.com's transaction process for customers.  Webloyalty and Amazon.com know that Webloyalty's pop-up advertising on Amazon.com is designed to appear to be an offer made by Amazon.com.  Webloyalty and Amazon.com know that Webloyalty offers no real service to Amazon.com customers, but rather is executing a business plan designed to trick the customers of Amazon.com and other on-line retailers into incurring charges for services that either does not exist, is unwanted, will not be utilized and/or that, if the truth were known, Plaintiff and the Class would not enroll in.

109.    Amazon.com represents to its customers that their transaction are safe and secure and their personal billing information will only be used for purposes of the transaction in which they are engaged.  In contradiction to those representations, Amazon.com performs the "data pass" whereby the very personal billing information entrusted to Amazon.com by its customers is conveyed to Webloyalty, for the purpose of causing Amazon.com's customers to incur monthly charges for  a service that either does not exist, is unwanted, will not be utilized and/or that, if the truth were known, Plaintiff and the Class would not enroll in.

110.    Plaintiff and the Class relied on Webloyalty's and Amazon.com's misrepresentations and statements or omissions and were damaged thereby when unauthorized charges were made to their credit and debit card accounts.  Webloyalty provided no service,

product or meaningful benefit to Plaintiff and the Class that could justify the imposition of any such charge upon them.  Webloyalty, thus, profited by defrauding Plaintiff and the Class.  Amazon.com likewise benefitted in that, by defrauding Plaintiff and the Class, it received a bounty and other remuneration for each customer deceived into enrolling in a Webloyalty program, such as Shoppers Discounts.  These bounties and other remuneration constituted 100% profit for Amazon.com.

111.    As a proximate result of Webloyalty's and Amazon.com's fraud, Plaintiff and the Class have been damaged in the amount that was improperly charged to their credit and debit cards, as well as other resulting damages.

112.    Webloyalty and Amazon.com's conduct was motivated by malice, fraud and oppression, and was done in conscious disregard of the rights of Plaintiff and the Class.  Punitive damages should be assessed against Webloyalty and Amazon.com in an amount that would punish and deter them from further engaging in fraudulent conduct.

113.    Webloyalty and Amazon.com were under a duty to Plaintiff and the Class to disclose the true facts because they are in a superior position to know the truth about Webloyalty's programs, such as Shopper Discounts, and the data pass process by which a charge would be incurred on Plaintiff and the Class and the truth concealed from them.

114.    Webloyalty and Amazon.com's conduct has been and is wanton and/or reckless and/or shows a reckless indifference to the interests of others.

115.    Plaintiff and the Class demand judgment against Webloyalty and Amazon.com for actual and punitive damages for themselves and each member of the Class, plus attorneys' fees, expenses and costs.

## COUNT VIII

**For Violations of CUTPA Against Webloyalty and Amazon.com**

116.    Plaintiff repeats and realleges the allegations contained in each of the preceding paragraphs as if fully set forth herein.

117.    This claim is brought on a class-wide basis by Plaintiff on his own behalf and on behalf of all other persons similarly situated who are residents of this State or injured in this State to recover damages pursuant to Connecticut General Statutes § 42-110g.

118.    As described in the preceding paragraphs, Webloyalty and Amazon.com engaged in unfair or deceptive acts or practices in the conduct of trade or commerce.  Webloyalty, pursuant to an agreement with Amazon.com, designed a pop-up advertisement that appears to be part of the transaction purchase process on Amazon.com's website.  Webloyalty and Amazon.com knew that Plaintiff and the Class would be deceived by that pop-up advertisement and intended to so deceive Plaintiff and the Class.  Webloyalty and Amazon.com know that the pop-up advertisement is not part of, nor necessary for, the transaction purchase process with Amazon.com.  Webloyalty and Amazon.com know that the terms of the pop-up advertisement are also deceptive and unfair.  Such advertisements typically offer a coupon for the next purchase on the on-line retailer's website, but no such coupon is given to the customer.  Indeed, Webloyalty and Amazon.com know that consumers who are tricked into enrolling in Webloyalty's programs, such as Shopper Discounts, are unlikely to ever use any good or service purportedly offered by Webloyalty programs, such as Shopper Discounts.  Thus, Webloyalty and Amazon.com, in violating CUTPA as alleged herein, acted intentionally or, at a minimum, with reckless disregard for Plaintiff's rights and the rights of the members of the Class.

33

119.    Plaintiff and the Class suffered an ascertainable loss, and have been otherwise

damaged, as a result of Webloyalty and Amazon.com's use or employment of a method, act or

practice prohibited by Connecticut General Statutes § 42-110b.  Plaintiff seeks, on behalf of

himself and the Class, the recovery of actual damages, as well as attorneys' fees, punitive

damages and equitable relief as the Court deems just and proper.

120.    The fraudulent and deceptive acts and practices of Webloyalty and Amazon.com

present an ongoing threat and continuing likelihood of deception to Plaintiff, the Class and

members of the public, and support issuance of an injunction to prevent the continuing violations

of CUTPA.

## COUNT IX

### For Aiding And Abetting Against Visa

121.    Plaintiff repeats and realleges the allegations contained in each of the preceding

paragraphs as if fully set forth herein.

122.    Visa has extensive rules concerning how merchants must conduct themselves

when accepting Visa cards.  Visa also has a fraud monitoring program aimed at identifying and

preventing fraudulent merchants from accepting Visa.  Webloyalty and Amazon.com's conduct

described herein, including the "data pass" process, violate Visa's operating rules and generate

high volumes of customer complaints.  Indeed, Webloyalty has triggered fraud warning or fraud

monitoring procedures within Visa.  However, Visa allowed Webloyalty to continue to charge

millions of consumers monthly fees that the consumers had not authorized because it chose not

to enforce its own rules and, in fact, processed such transactions in violation of a number of

Visa's general rules for merchants and specific rules for "card-not-present transactions."

34

123.     By its conduct, Visa aided and abetted Webloyalty and Amazon.com in the conduct upon which each claim pled herein is based.  Webloyalty and Amazon.com, through their conduct described herein, performed a fraudulent act causing injury.  Visa was aware of its role as part of an overall illegal or tortious activity at the time it assisted Webloyalty and Amazon.com.  Visa knowingly and substantially assisted Webloyalty and Amazon.com.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and all others similarly situated, prays for relief and judgment against Defendants as follows:

A.   For an Order certifying the Class under the appropriate provisions of Federal Rule of Civil Procedure 23, as well as any appropriate subclasses, and appointing Plaintiff and his legal counsel to represent the Class;

B.   For an Order preliminarily and permanently enjoining Defendants from engaging in the conduct alleged herein;

C.   For such other injunctive and declaratory relief as may be just and proper;

D.   For an Order requiring restitution and disgorgement of any profits from the improper conduct alleged herein from Defendants to the extent permitted by applicable law, together with interest thereon from the date of payment;

E.   For an Order providing for statutory damages according to proof;

F.   For an Order providing for general damages according to proof;

G.   For special damages according to proof;

H.   For exemplary or punitive damages;

I.   A declaration that Defendants are financially responsible for notifying all Class of the pendency of this action;

J.   Reasonable attorneys' fees, consultants' fees, experts' fees, and costs and expenses;

K.   Statutory pre-judgment interest; and

L.   For such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff, on behalf of himself and the Class, demand a jury trial for all of the claims so triable.

THE PLAINTIFF

/s/ Patrick A. Klingman
James E. Miller (ct21560)
Patrick A. Klingman (ct17813)
Karen Leser-Grenon (ct23587)
Shepherd, Finkelman, Miller & Shah, LLP
65 Main Street
Chester, CT  06412
(860) 526-1100
(860) 526-1120 (facsimile)
jmiller@sfmslaw.com
pklingman@sfmslaw.com
kleser@sfmslaw.com

Joseph H. Weiss
David C. Katz
Weiss & Lurie
551 Fifth Avenue
New York, NY 10176
(212) 682-3025
(212) 682-3010 (facsimile)

His Counsel