# EXHIBIT J



# COMMITTEE ON COMMERCE, SCIENCE, AND TRANSPORTATION

## OFFICE OF OVERSIGHT AND INVESTIGATIONS
## MAJORITY STAFF

# SUPPLEMENTAL REPORT ON AGGRESSIVE SALES TACTICS ON THE INTERNET

## Staff Report for Chairman Rockefeller
## May 19, 2010

## Table of Contents

**Executive Summary**.................................................................................................i

**I.**    **The Commerce Committee's Investigation**...................................................1

**II.**    **E-Commerce Companies' Response to the Committee's Investigation**........2

**III.**    **Additional Information on Aggressive Post-Transaction Sales Practices**....5
       a.   "Refund Mitigation"..........................................................................7
            i.   Cancelling without a refund.......................................................7
            ii.   Escalation...................................................................................8
            iii.   Multiple membership................................................................11
       b.   "Damage Control".............................................................................14

**IV.**    **The Role of Credit Card Companies and Banks in the Post-Transaction Sales Industry** .................................................................................................17
       a.   Credit Card Company Rules for Merchants.....................................17
       b.   Chargebacks vs. Refunds...................................................................18

**V.**    **Conclusion**.........................................................................................20

**Exhibits**

**Exhibit 1:**    Transcript and Audio of Call between Delci Lev and Vertrue/Adaptive Marketing Call Center Supervisor – February 2009

## Executive Summary

In November 2009, Chairman Rockefeller released a Committee staff report and held a hearing which showed that three Connecticut-based companies – Affinion, Vertrue, and Webloyalty – used a set of online sales tactics to charge millions of consumers over a billion dollars for membership clubs and services the consumers did not want and were unaware they had purchased. The hearing and staff report presented the initial findings of an investigation Chairman Rockefeller opened in May 2009, after learning that many consumers, law enforcement officials, and consumer advocates had alleged that Affinion, Vertrue, and Webloyalty's business practices were misleading and deceptive.

The November staff report and hearing explained in detail how Affinion, Vertrue, and Webloyalty employed aggressive tactics to "enroll" consumers in membership clubs and charge them monthly fees. The three companies presented misleading "post-transaction" sales offers to consumers who were completing purchases of goods and services on familiar websites. These "post-transaction" offers usually promised cash back rewards and were designed to appear as if they were part of the initial transaction. Part of this offer was a free trial period, after which consumers would be regularly charged until they acted to cancel the memberships (a "negative option").

The most problematic feature of this process was the way the three companies acquired consumers' billing information. Using a so-called "data pass" process, the initial merchants "passed" consumers' billing information to Affinion, Vertrue, and Webloyalty without requiring consumers to re-enter their credit or debit card numbers. Hundreds of well-known, reputable websites partnered with Affinion, Vertrue, and Webloyalty and passed their customers' credit card and debit card numbers for financial gain.

This supplemental report provides information about what happened to the millions of consumers after they were "enrolled" in the clubs as a result of the deceptive sales tactics employed by Affinion, Vertrue, Webloyalty, and their online partners. It describes the multiple barriers consumers faced when they realized—often after being billed for many months—that they had inadvertently enrolled in the clubs and sought to cancel their memberships and receive refunds. It details the basic two-step business model all three companies followed: 1) use deceptive sales tactics to charge consumers' credit and debit card accounts, and 2) after consumers discover the unauthorized charges, refund as little of their money as possible. Some of the findings of this report include:

- **Refund Mitigation:** In a practice known as "refund mitigation," the three companies created scripts and policies intended to minimize the amount of money they would have to return to consumers who had inadvertently enrolled in the clubs. The companies trained their call representatives to quickly cancel ("stop bill") consumers' accounts, which they calculated would discourage consumers from requesting refunds. When consumers insisted on refunds for the unauthorized monthly fees they had been charged through the negative option billing process, the companies employed a variety of tactics to keep the refund amounts as small as possible, including requiring customers to request refunds in writing.

i

- **Magic Words:** Each company instructed their call center representatives not to issue refunds to consumers, unless the consumers mentioned certain key words like "attorney general," "Better Business Bureau," or "bank representative." These policies were designed to satisfy those consumers who were most likely to create additional "customer noise" and reputational damage for the companies. Consumers who did not mention the "magic words" did not receive full refunds.

- **Multiple Memberships:** Because they could encounter the aggressive sales tactics of Affinion, Vertrue, and Webloyalty while shopping on hundreds of different websites, consumers frequently enrolled inadvertently in multiple membership clubs offered by the same company. Consequently, many customers who called Affinion, Vertrue, or Webloyalty to cancel one membership and request a refund were actually enrolled in more than one of the company's clubs. Webloyalty and Vertrue trained their agents not to inform consumers about these additional memberships. One Webloyalty employee summarized her view of the practice by stating in an internal e-mail, "Do I agree with that thought process-No-but it is what it is! Feels sneaky to me—especially in this economy."

- **Failure to Follow Credit Card Rules:** Affinion, Vertrue, and Webloyalty violated MasterCard and Visa's rules for credit card and debit card transactions and American Express placed the companies in monitoring programs for merchants with high rates of disputed charges from cardholders (known as "chargebacks"). Between 2006 and 2008, the three largest credit card companies processed 1.4 million chargeback requests and over 10 million refunds, totaling hundreds of millions of dollars, from cardholders disputing charges from Affinion, Vertrue, and Webloyalty. Despite these rule violations and the high volume of consumer complaints, the three companies enjoyed uninterrupted access to the payment systems operated by Visa, MasterCard, and American Express until late 2009. Once Chairman Rockefeller notified the credit card companies of the aggressive online sales tactics in December 2009, the companies quickly took action to ensure that Affinion, Vertrue, Webloyalty, and their e-commerce partners were in compliance with their rules for merchants and that their cardholders were no longer subject to the misleading "data pass" process.

## I.    The Commerce Committee's Investigation

On May 27, 2009, the Senate Committee on Commerce, Science, and Transportation opened an investigation into a set of online sales tactics that many consumers, law enforcement officials, and consumer advocates alleged were misleading and deceptive. The Committee's investigation initially focused on three Connecticut-based companies – Affinion, Vertrue, and Webloyalty – that were using the tactics to aggressively sell their club memberships to consumers as the consumers were in the process of buying movie tickets, plane tickets, or other online goods and services on reputable websites.[1] The investigation focused on these three companies because thousands of consumers had complained to the Better Business Bureau, state attorneys general, and consumer-oriented websites that these companies had charged them fees for membership clubs without their consent.

In August 2009, Committee staff expanded the scope of the investigation to include the reputable websites that gave the three Connecticut companies access to their customers' billing information through a so-called "data pass" process, which enabled the three Connecticut companies to acquire billing information from millions of consumers who would have not otherwise provided it. Committee staff interviewed dozens of online merchants and e-commerce companies that shared their customers' billing information with Affinion, Vertrue, and Webloyalty, as well as dozens of their customers who had complained about the companies' actions. On November 6, 2009, Chairman Rockefeller sent requests for information to sixteen online merchants and e-commerce companies that had earned large profits through partnering with Affinion, Vertrue, and Webloyalty.

On November 16, 2009, the Committee's Oversight and Investigations staff submitted an initial report ("November Staff Report") on the investigation to Chairman Rockefeller.[2] The next day, November 17, 2009, the Committee held a hearing on "Aggressive Sales Tactics on the Internet and Their Impact on American Consumers," during which consumers and expert witnesses testified about the aggressive tactics that many online merchants used to charge consumers for club memberships the consumers did not want and were unaware they purchased.[3]

The hearing and report presented an extraordinarily damaging set of facts about the "data pass" process and other tactics that many online sellers had employed against their customers. Affinion, Vertrue, and Webloyalty and their e-commerce partners generated over $1.4 billion in revenue by employing tactics that had caused millions of consumers to unknowingly enroll in and be charged for their membership programs. Despite having clear evidence showing

---

[1] Letter from Chairman John D. Rockefeller IV to Mr. Gary A. Johnson, President and Chief Executive Officer, Vertrue, Inc. (May 27, 2009); Letter from Chairman John D. Rockefeller IV to Mr. Richard J. Ferndandes, Chief Executive Officer, Webloyalty.com, Inc. (May 27, 2009); and Letter from Chairman John D. Rockefeller IV to Mr. Nathaniel Lipman, President, Affinion Group, Inc. (Jul. 10, 2009).

[2] Senate Committee on Commerce, Science, and Transportation, *Staff Report on Aggressive Sales Tactics on the Internet and Their Impact on American Consumers* (hereinafter "November Staff Report") (Nov. 16, 2009) (available at http://commerce.senate.gov).

[3] Senate Committee on Commerce, Science, and Transportation, *Hearing on Aggressive Sales Tactics on the Internet and Their Impact on American Consumers,* 111th Cong. (Nov. 17, 2009).

consumers were being misled, the companies continued to use a combination of three aggressive sales tactics – post-transaction marketing, the "data pass" process, and negative options – to enroll online consumers in their membership programs or discount clubs.[4]

On December 3, 2009, the Committee further broadened its inquiry by requesting information from the three largest credit card companies about the volume of charges, refunds, and "chargebacks" they processed for Affinion, Vertrue, and Webloyalty.[5]  The Committee requested this information from Visa, MasterCard, and American Express because the "data pass" process used by online merchants to enroll consumers in membership clubs appeared to violate both the generally-accepted norms of online commerce and the credit card companies' rules for online transactions.

In addition to these Committee activities, on March 18, 2010, an Iowa state court issued a decision in a lawsuit the State of Iowa filed against Vertrue in 2006, alleging that the company's sales tactics violated Iowa consumer protection laws.  After extensive discovery and a two-week bench trial, the court found that Vertrue's marketing practices violated both Iowa's Buying Club Membership Law and Consumer Fraud Act.[6]  The court found that Vertrue's representation of "risk-free" trial memberships was deceptive and observed:

> …it is clear from the record that assenting to a trial membership was anything but risk free.  In fact, Vertrue's scheme for selling its memberships imposes a number of serious risks for consumers, from the very outset of the transaction.  The evidence shows that the vast majority of consumers were billed for memberships that they did not knowingly enroll in, and were charged for memberships that they never wanted or used.  Numerous consumers have had to expend considerable time and effort to cancel memberships, dispute charges, and (sometimes) obtain refunds.[7]

## II.    E-Commerce Companies' Response to the Committee's Investigation

Affinion, Vertrue, and Webloyalty have each made changes to their online marketing practices to address concerns raised by the Committee's investigation and findings.  Prior to the Committee's hearing in November 2009, each company announced that it would begin requiring online consumers to enter the last four digits of their credit card numbers before it would enroll them in a membership club using data pass.[8]  The companies assured the Committee that this change would eliminate consumer confusion, but expert witnesses testifying at the November

---

[4] For a more in depth explanation of post-transaction marketing, data pass, and negative options, see the November Staff Report.

[5] Senate Committee on Commerce, Science, and Transportation, *Chairman Rockefeller Continues Fight to Protect American Consumers and Combat Aggressive Sales Tactics on the Internet: Requests Information from Major Credit Card Companies on Cardholder Inquiries Connected to these Aggressive Sales Tactics* (Dec. 3, 2009).

[6] Ruling as to Liability, *Iowa v. Vertrue*, IA Dist. Ct. for Polk County (Mar. 18, 2010) (EQ 53486).

[7] *Id*, at 41.

[8] November Staff Report, 3.

hearing explained why the new four-digit requirement would not fix the problems with the companies' marketing practices.

Florencia Marotta-Wurgler, a professor at New York University School of Law who testified at the hearing and purposely enrolled in a Webloyalty program through a four-digit requirement process connected to Fandango's website, explained that "not only online but also offline, one associates giving the last four digits of a credit card number as a way of verifying your identity, not as a way of paying."[9] She went on to note that, "[I]nserting the last four digits of my credit card didn't require any extra effort. It didn't really require that much more attention because I thought that Fandango was the one offering me my $10 for being a loyal customer and that they were just trying to see that I was the person who I was claiming to be."[10] Prentiss Cox, a law professor and former Assistant Attorney General for the State of Minnesota, added, "the collection of four digits of a 16 digit account number…is highly unlikely to eliminate the problems."[11]

In the weeks following the Committee's November hearing, Affinion, Vertrue, and Webloyalty each sent a letter to Chairman Rockefeller informing him that they would begin requiring online consumers to enter not just the last four digits, but their full sixteen-digit credit card or debit card numbers in order to enroll in one of the companies' membership programs on the Internet.[12] These letters came following the Committee's decision, in December 2009, to ask American Express, MasterCard, and Visa why they processed millions of charges submitted by Affinion, Vertrue, and Webloyalty, even though the three companies did not have have the cardholders' authorization for the charges.[13] As will be discussed further below, Committee staff had determined, and the credit companies later confirmed, that the practices of Affinion, Vertrue, and Webloyalty were violating the rules the credit card companies had established for "card-not-present" transactions, which apply to credit card transactions over the Internet.

On November 6, 2009, the Committee sent requests for information to sixteen e-commerce companies that had entered into partnerships with Affinion, Vertrue, and Webloyalty

---

[9] Senate Committee on Commerce, Science and Transportation, Testimony of Professor Florencia Marotta-Wurgler, *Hearing on Aggressive Sales Tactics on the Internet and Their Impact on American Consumers,* 111th Cong. (Nov. 17, 2009).

[10] *Id.*

[11] Senate Committee on Commerce, Science and Transportation, Testimony of Professor Prentiss Cox, *Hearing on Aggressive Sales Tactics on the Internet and Their Impact on American Consumers,* 111th Cong. (Nov. 17, 2009).

[12] Senate Committee on Commerce, Science and Transportation, *Chairman Rockefeller's Investigation Causes E-Commerce Companies to Discontinue Misleading Marketing Tactic* (Jan. 21, 2010) (available at http://commerce.senate.gov).

[13] Letter from Chairman John D. Rockefeller IV to Mr. Kenneth Irvine Chenault Chairman and Chief Executive Officer, American Express Company (Dec. 3, 2009); Letter from Chairman John D. Rockefeller IV to Mr. Robert W. Selander, Chief Executive Officer, MasterCard WorldWide (Dec. 3, 2009); and Letter from Chairman John D. Rockefeller IV to Mr. Joseph W. Saunders, Chairman and Chief Executive Officer, Visa, Inc. (Dec. 3, 2009).

and had shared their customers' billing information with the three companies.  The letters were sent to:

- 1-800-Flowers.com, Inc.
- AirTran Holdings, Inc.
- Classmates.com, Inc.
- Continental Airlines, Inc.
- FTD, Inc.
- Fandango, Inc.
- Hotwire, Inc.
- Intelius, Inc.
- Movietickets.com, Inc.
- Orbitz Worldwide, Inc.
- Pizza Hut, Inc.
- Priceline.com, Inc.
- Redcats USA, Inc.
- Shutterfly, Inc.
- US Airways Group, Inc.
- Vistaprint USA, Inc.

At the time the November Staff Report was released, some of the sixteen companies had not yet provided responses to the Committee's request.  The Committee has now received responses from each of the sixteen companies.

Many of the sixteen companies initially responded with views that contradicted the evidence the Committee had uncovered related to consumers' experiences with Affinion, Vertrue, and Webloyalty.  In both their initial conversations with Commerce Committee staff and the response letters, many online merchants expressed confidence that their customers were not inadvertently signing up for services offered by Affinion, Vertrue, or Webloyalty and that they were benefiting from these services.

For example, in an initial telephone conversation and letter, a Senior Vice President of Fandango told the Committee his company received very few "customer contacts" about its partnership with Webloyalty and that it used the "data pass" process "to facilitate the ease and convenience of the free trial enrollment process for the customer."[14]  In January 2010, Fandango wrote Chairman Rockefeller a second letter informing him that the company had undertaken a "thorough review and evaluation" of its post-transaction membership programs, and had decided to end the "data pass" process and take new steps to avoid "consumer confusion."  According to documents reviewed by Committee staff, Fandango earned more than $40 million in revenue between July 2002 and June 2009 through partnerships with Affinion and Webloyalty.

Responses from the other companies followed a similar pattern.  AirTran initially informed the Committee that it employed "a 'data pass' process to enable easier enrollment" and that it "believes that the practices in place provide customers with full information on which to make an informed decision."[15]  AirTran later informed the Committee it "ended its participation

---

[14] Telephone conversation between Staff, Senate Commerce Committee, and Stacey Olliff, Esq., Senior Vice President, Legal and Business Affairs, Fandango (Sept. 16, 2009); Letter from Stacey Olliff, Esq., Senior Vice President, Legal and Business Affairs, Fandango to Chairman John D. Rockefeller, IV (Nov. 16, 2009).  In the November 16 letter, Mr. Olliff informed the Committee that "Fandango's current relationship with Webloyalty started in June 2008."  In fact, Fandango's business relationship with Webloyalty actually dates back to 2002.

[15] Letter from Richard Magurno, Senior Vice President, General Counsel, and Secretary, AirTran Airways, to Chairman John D. Rockefeller IV (Nov. 10, 2009).

in Affinion's Great Fun program and terminated the agreement covering the program."[16]  United Online, the parent company of FTD and Classmates.com, originally informed the Committee that "FTD and Classmates.com believe that the disclosure regarding transfer of the customer billing information on the relevant websites is clear, and that the customer is consenting to the transfer of the customer billing information."[17]  It later informed the Committee that both FTD and Classmates.com had canceled their contracts with Webloyalty and Vertrue.[18]

## III.    Additional Information on Aggressive Post-Transaction Sales Practices

The November Staff Report detailed the aggressive online sales practices Affinion, Vertrue, and Webloyalty used to "enroll" millions of unsuspecting consumers in their membership clubs.  With the cooperation of their online "partners," the three companies inserted their sales offers into the "post-transaction" phase of an online purchase, after consumers had made a purchase but before they had completed the sale confirmation process.  These offers generally promised cash back rewards and appeared to be related to the transaction the consumer was in the process of completing.  Misleading "Yes" and "Continue" buttons caused consumers to reasonably think they were completing the original transaction, rather than entering into a new, ongoing financial relationship with a membership club operated by Affinion, Vertrue, or Webloyalty.

Evidence presented in the November Staff Report showed that only a small percentage of club members had any understanding they had been enrolled in these clubs.  Member surveys conducted by the companies repeatedly showed that most consumers were not aware they were enrolled in and being charged for the programs.  Internal e-mail messages obtained from the companies showed that the companies' employees were aware that consumers were unknowingly enrolling in the programs.  Typically, consumers only learned they had been enrolled in the clubs when they spotted mysterious fees on their credit card or bank statements.  These small charges, generally between $10 and $20, were accompanied by bill descriptors such as "RESERVATION REWARDS 800-7327031."

Other than providing a toll-free telephone number, such descriptors provided little useful information to consumers about the source of these charges.  Because it generally took consumers at least several months to discover these "all but invisible" charges and initiate the process of canceling the club membership, the companies improperly collected multiple monthly fees from consumers who had never consented to them.  This exploitation of consumers' confusion was made possible by the "negative option" billing process, which permitted the

---

[16] Letter from Richard Magurno, Senior Vice President, General Counsel, and Secretary, AirTran Airways, to Chairman John D. Rockefeller IV (Dec. 21, 2009).

[17] Letter from Charles Butler Ammann, Executive Vice President and General Counsel, United Online, to Chairman John D. Rockefeller IV (Nov. 17, 2009).

[18] Letter from Charles Butler Ammann, Executive Vice President and General Counsel, United Online, to Chairman John D. Rockefeller IV (Feb. 16, 2010).

5

companies to charge consumers as long as consumers took no action. Consumer action was impossible, of course, until consumers actually noticed the charges.[19]

At the Committee's November 17 hearing, Linda Lindquist, a consumer from Sussex Wisconsin, testified that in July 2007, she had unknowingly enrolled in two separate Webloyalty membership clubs while purchasing movie tickets for herself and her daughter on the Movietickets.com website. She and her husband did not discover these charges on her credit card statement until October 2008. Ms. Lindquist testified:

> I did not know what these charges were for but I told my husband that I would look into it. I first called the 800 number that was listed on the credit card statement. I spoke with a customer service representative who told me that I had signed up for Reservation Rewards and Shoppers Discounts online after a movie ticket purchase on Movietickets.com.

> I told the representative that I had not knowingly signed up for this service and asked how they had gotten my credit card number. She stated that Movietickets.com gave them my credit card number. I then asked what service, exactly, I was paying for. She stated that they offer coupons and discounts for restaurants and hotels. I told the representative that I had never gotten any correspondence, either online or via mail regarding my so-called membership.

> I then asked her to cancel my membership and also to tell me how much money I had paid to date. She replied that I had paid $320.00. I was shocked! I asked if she could refund my money since I had no idea that I had even subscribed to this service. She stated that she would cancel my membership and could credit me the last month's payment of $20.00.[20]

This section will provide more information about what happened to consumers like Ms. Lindquist once they were "enrolled" in the membership clubs. The goal of these clubs was not to provide services, but to charge consumers' credit cards for as many months as possible before consumers discovered their memberships and canceled them. As Professor Robert Meyer of The Wharton School of the University of Pennsylvania testified before the Committee, the Connecticut companies' goal was not to market legitimate products, but to "earn profits by luring

---

[19] In the recent Iowa *Vertrue* decision, the court noted: "Some features of Vertrue's overall sales operation created special hazards for consumers. Unlike Vertrue's memberships, most consumer goods are tangible. Thus, for example, if a membership arrangement involves the periodic review of books or CDs on a negative option basis, the receipt of the items themselves serves as unequivocal notice to the consumer of the fact of membership and its attendant obligations. By contrast, a membership that provides "access" to benefits may be all but invisible and may have little concrete presence in a consumer's life, especially in instances where the consumer is not even aware of purchasing "access" in the first place. *Vertrue*, at 33.

[20] Senate Committee on Commerce, Science, and Transportation, Testimony of Ms. Linda Linquist, *Hearing on Aggressive Sales Tactics on the Internet and Their Impact on American Consumers*, 111th Cong. (Nov. 17, 2009).

consumers into paying for memberships in programs that they would not subscribe to given their full awareness."[21]

### A. *"Refund Mitigation"*

Because the vast majority of consumers were not aware they "belonged" to these clubs, their sole interaction with Affinion, Vertrue, and Webloyalty came once they noticed unfamiliar charges on their credit card or bank statements and called the toll free number in the bill descriptor. The companies' financial success crucially depended on the outcome of these calls. If consumers like Ms. Lindquist retained the membership or canceled their membership without asking for a refund (known in the industry as a "stop bill" request), the membership clubs earned all of the monthly fees the consumers had paid up to that point. If the clubs were required to refund all or part of the money they had already charged the consumers, they earned less profit.

The three companies all appear to have been following the same basic business plan: improperly charge consumers' credit cards for services the companies knew consumers did not intend to purchase and were not using, and then refund as small a portion of this money as possible after consumers discovered the charges. The less money these companies refunded, the more profits they earned. Documents reviewed by Committee staff reveal the sophisticated policies and procedures Affinion, Webloyalty, and Vertrue set up to minimize the amount of improper charges they refunded to the millions of confused and angry consumers who contacted them each year. Employees at Vertrue actually referred to these policies and procedures as "refund mitigation."[22]

***Canceling Without a Refund***   Employee handbooks and call center scripts produced to the Committee by Affinion, Vertrue, and Webloyalty show that each company's call center representatives were trained to minimize the refunds they provided to customers. These materials instructed call center representatives to direct customers to a "stop bill" outcome, in which the consumer is offered a prompt cancellation without refunds.[23] A Webloyalty "stop bill" script instructed call representatives to use the following language:

> Rep:  I show that your last charge took place on <date> and effective immediately I have stopped all future billings so you will no longer be charged.  You can continue to access the site and use your <service> benefits through the current month's term, which ends on <end of term date>.  I will be sending you an email with a reference number to confirm this cancellation and that you will no longer be billed.  Can you please confirm your <read domain out loud>.[24]

---

[21] Senate Committee on Commerce, Science and Transportation, Testimony of Professor Robert Meyer, *Hearing on Aggressive Sales Tactics on the Internet and Their Impact on American Consumers,* 111th Cong. (Nov. 17, 2009).

[22] E-Mail from Jay Sung, Chief Executive Office of Adaptive Marketing, to Vertrue employees (Aug. 6, 2008) (Vertrue Doc. 54592).

[23] Webloyalty document, "Settlement Training Manual - Settlement Refresher" (Webloyalty Doc. 24997).

[24] Webloyalty document, "New Hire Training Manual 2009 - Voice Scripts" (Webloyalty Doc. 24578).

Webloyalty's protocols required representatives to offer the stop bill script to all consumers, even those who called and immediately requested refunds. Employees who mentioned refunds before attempting a stop bill resolution were given poor evaluations by their supervisors. One Webloyalty representative who was given the lowest possible score of "0" on a call by his supervisor was told:

> What you did on that call was start to use the stop bill script and then decide on your own not to use it and just give the member the money back.[25]

After receiving an e-mail encouraging representatives to listen carefully to their customers, a Webloyalty phone representative replied:

> Unfortunately if I listen too well I get a zero for not using the stop bill script. I have been told we need to ignore what they say and use the stop bill script.[26]

While Webloyalty required its call center employees to steer unhappy consumers to the stop bill script, Affinion and Vertrue encouraged their phone representatives to take a more aggressive approach.[27] According to a 2008 Vertrue employee guide, call representatives got five extra evaluation points for retaining (or "saving") members through what the company called "final billing option" (FBOs).[28]

According to an Affinion document describing the customer refund process, Affinion agents were instructed to present at least one "rebuttal" to all cancelling members, except in cases where "member is irate, uses threatening language or legal verbiage."[29] The company carefully tracked its "retention" percentages and viewed them as a significant source of revenue for itself and its partners. One Affinion executive noted that allowing consumers to cancel their membership through a website would hurt revenues because it would result in "0% retention."[30]

***Escalation***    Like Ms. Lindquist, many angry consumers refused to accept the companies' offer to simply cancel the membership with no refund. At that point, they entered a so-called "escalation" process, in which Affinion, Vertrue, and Webloyalty

---

[25] Internal Webloyalty e-mail (Jul. 9, 2004) (Webloyalty Doc. 74368).

[26] Internal Webloyalty e-mail (May 18, 2004) (Webloyalty Doc. 74473).

[27] Webloyalty appears to have dropped the member rebuttal in 2004, after determining that it was irritating for the customer and did not help the company's efforts to avoid multiple refunds. Webloyalty document, "Frequently Asked Questions for Call Center Representatives" (Webloyalty Doc. 73211).

[28] Vertrue document, "Retail – Member Experience Raters Guide" (Jun. 4, 2008) (Vertrue Doc. 91681). During the November 2009, trial in Iowa, Vertrue Vice President Jeff Paradise testified that Vertrue did not attempt to "save" memberships "by dissuading consumers who call to cancel." On cross examination, however, Mr. Paradise said that Vertrue had only eliminated this "save" policy in August 2008. Ruling as to Liability (Mar. 18, 2010), *Iowa v. Vertrue*, IA Dist. Ct. for Polk County (EQ 53486), 42.

[29] Internal Affinion e-mail (Oct. 30, 2008) (Affinion Doc. AFSE-04-3749).

[30] Internal Affinion e-mail (Oct. 22, 2008) (Affinion Doc. AFSE-04-3185).

representatives individually negotiated refunds with their "members." The goal in this process was to refund as little money as possible to the consumer. A 2009 Vertrue handbook provided employees with the following instructions:

> When you have reached the 3rd step of the T&C [Terms and Conditions] scripting, this is where you would be negotiating with the member. You must try and save as many charges as you can without having the member feel the need to call back and speak to someone else. You must use your judgment and keep in mind your goal of 38% refund.[31]

Webloyalty representatives were instructed to first offer a one-month refund and then a two-month refund. If the consumer insisted on a refund going back further than two months, Webloyalty required the consumers to fill out and send an affidavit to the company. In a document it provided to call center representatives, Webloyalty explained that this procedure should be strictly followed. The document stated:

> It is important that you are not offering the affidavit as a means to end a difficult call. You must follow the scripts, offering the member one, then two refunds with a <u>pause</u> before you offer to send them the affidavit.

>        <u>Example</u>

> | | |
> |---|---|
> | **Member:** | I have these charges on my statement, I don't know what they are so I want to cancel and I want my money back. |
> | **Rep:** | Script A—Stop Bill |
> | **Member:** | What about my money |
> | **Rep:** | Script B—one month |
> | **Member:** | that's nice, but I want it all |
> | **Rep:** | Script C—top only with a pause |
> | **Member:** | Thanks for the two months, but I see 5 other charges that I want back. |
> | **Rep:** | Affidavit process[32] |

The only exceptions to these instructions were "Death of a Member or Child Join."[33] The refresher explained that "<u>these are the only circumstances</u> that a full refund is to be processed, you do not need to go through the one refund, two refund, you can go immediately to full refund, no affidavit, action sheet."[34]

---

[31] Vertrue document, "Customer Care Representative Evaluation Criteria, Appendix A – Enforcing Terms & Conditions" (Jan. 9, 2009) (Vertrue Doc. 35274).

[32] Webloyalty document, "Settlement Training Manual - Settlement Refresher" (Webloyalty Doc. 024997).

[33] *Id.*

[34] *Id.*

During this negotiation process, representatives were instructed not to offer information to consumers about specific charges or how long the companies had been charging their accounts, unless consumers directly requested the information. For example, in April 2009, a senior official in Vertrue's call center critiqued a call center representative for volunteering that a consumer had been unknowingly paying membership charges since 2007. The official wrote:

> On the 6[th] call, why did the rep say "…it goes all the way back to 2007"? I can't believe she got off that one without refunds galore! That one was scary…[35]

While the companies could have quickly issued complete refunds to the consumers' credit card or bank accounts, they appear to have required written requests for larger refunds because they knew a substantial portion of consumers would neglect to submit the paperwork. In a 2008 survey of cancelled memberships, Webloyalty found that fewer than half of the consumers who had been sent "Additional Refund Request" forms had returned them.[36] When several Affinion clients proposed making it easier for consumers to get refunds for periods longer than two months by changing the company's write-in policy, an Affinion senior vice president warned, "there are significant financial ramifications of changing this policy."[37]

Consumers could significantly increase their chances of getting quick and full refunds from Affinion, Vertrue, or Webloyalty if they used certain terms or if they threatened to contact outside entities such as banks, credit card companies, legal authorities, or the partner website where the consumer had been shopping when he or she unknowingly enrolled in the club. Affinion's protocols, as they were described in a company e-mail in late 2008, required agents to "escalate" calls from consumers who were irate, who used legal verbiage, or claimed they had previously canceled their membership. "Escalated" calls would be handled by more experienced "Support Agents" who had the authority to issue refunds for periods longer than two months.[38] Consumers who directly contacted Affinion's partner companies, such as AirTran or Priceline, would be sent directly to representatives at Affinion's "Office of the President," in Westerville, Ohio, who were authorized to issue complete refunds.

A guide prepared for Vertrue call representatives advised them to stick with the stop bill script (the "T&C script"), except under certain circumstances, such as:

- Member states "Didn't Authorize";
- If the Member mentions calling a Bank or Credit Card Representative;

---

[35] Internal Vertrue e-mail (Apr. 30, 2009) (Vertrue Doc. 35611).

[36] Webloyalty document, "2008 member survey" (Webloyalty Doc. 67245). Likewise, Vertrue required consumers to print out and mail back forms in order to redeem premium or discount offers. The Iowa District Court found that Vertrue's only purpose for this requirement was to reduce consumers' rate of redemption (or "breakage"). Vertrue also required consumers to fill out phony surveys to reduce breakage rates. Ruling as to Liability (March 18, 2010), *Iowa v. Vertrue*, IA Dist. Ct. for Polk County (EQ 53486), 38.

[37] Internal Affinion e-mail (Oct. 28, 2008) (Affinion Doc. AFSE-06-1843).

[38] Internal Affinion e-mail (Oct. 30, 2008) (Affinion Doc. AFSE-04-3749).

- If you received a call from a Bank or Credit Card Representative;
- Member mentions Attorney General/Better Business Bureau;
- Member mentions Fraud;
- Member mentions financial difficulties (i.e., bankruptcy, food stamps, lost job);
- Member is considering calling the client; and
- Member is considering contacting an attorney or the media.[39]

During the investigation, Committee staff reviewed audio recordings documenting calls between angry consumers and Vertrue call center representatives. These recordings show how the company used its "refund mitigation" tactics to make it as difficult as possible for consumers to get their money back.

One customer, Ms. Delci Lev of Connecticut, was enrolled in a Vertrue program called "PrivacyMatters1-2-3" through Classmates.com. When Ms. Lev demanded a refund, she was transferred by her call representative to a Vertrue supervisor named Theresa. During the four minute call, a transcript of which is attached as an exhibit to this report, Ms. Lev repeatedly asked Theresa for a refund. Following Vertrue's script, Theresa repeatedly told Ms. Lev that, "unfortunately, according to the terms of the conditions to which you agreed you are not entitled to any refund at the point of cancellation." At last Ms. Lev angrily replied, "all right, here we go, attorney general, department of consumer affairs, you got it Theresa." After Mrs. Lev mentioned the attorney general's office, Theresa immediately replied, "you will receive your credits within two business days."[40]

***Multiple Memberships***  Because the aggressive sales tactics and misleading offers of Affinion, Vertrue, and Webloyalty were available on hundreds of websites, online consumers often inadvertently enrolled in not just one membership club, but multiple membership clubs offered by the same company, which frequently had overlapping services. The fact that consumers enrolled in the same membership club, or similar membership clubs, offered by the same company further shows that consumers were unaware they were enrolling in these clubs.

For example, Ms. Lindquist testified before the Committee that through multiple transactions on Movietickets.com, Webloyalty had deceptively enrolled her in two separate membership clubs, "Reservation Rewards" and "Shoppers Discounts." According to Mrs. Lindquist, each of these clubs charged her $10 a month until she and her husband discovered the charges on their credit card bill more than a year later. During the November hearing, Senator Tom Udall discussed a case in which Dianne Morgan, a Santa Fe, New Mexico, small business owner, inadvertently enrolled in two clubs Vertrue offered through Vistaprint's website. The two clubs, "Business Max" and "Vistaprint Rewards," had overlapping services and Ms. Morgan had not intended to enroll in either of them. Once she found the unwanted recurring membership charges, Mrs. Morgan and her husband spent almost a year complaining to Vistaprint, Vertrue,

---

[39] Vertrue document, "CCR [Customer Care Representative] Job Aids" (Vertrue Doc. 54830).

[40] Vertrue audio file, "Ms. Delci Lev Call" (Vertrue Doc. 92210.006.wav) (available at: http://commerce.senate.gov).

the bank that issued her credit card, and finally, the Attorney General of Connecticut, to get her money back.[41]

To handle consumers who had inadvertently enrolled multiple times in their membership clubs, Affinion, Vertrue, and Webloyalty developed policies akin to their refund mitigation policies.[42] Rather than inform customers about their additional memberships when they called to cancel one membership program, both Vertrue and Webloyalty instructed their call center representatives to remain silent about the additional memberships, except under very specific circumstances.

A Webloyalty employee stated the following when explaining the company's policy on multiple memberships in an e-mail in July 2005:

> One thing I noticed in Mark's sales presentation that he thought I should make clear to the whole team -- cancel policy on multiple memberships. He thought we would make consumers aware of any 2nd membership they held. I told him, we ONLY do this for 2nd memberships they purchased from the same client. So if I have a RR [Reservation Rewards] and TVP [Travel Values Plus] from the same client, when I cancel RR, I'm told about TVP. But, if TVP was from a 2nd client, I wouldn't be told this.[43]

In 2008, Webloyalty's multiple membership policy reiterated this point:

> If the customer has multiple memberships that were joined through different clients then the only time you mention the additional membership(s) is if:
>
> - The customer states they never want to hear from us again
> - They are going to report us to the BBB, AG etc.
> - They are going to contact their bank
> - Call takes on a tone that could potentially be escalation/exception
>
> Then you must advise the member of the additional membership(s).[44]

In November 2008, two Webloyalty employees discussed the multiple membership policy when a training coordinator asked, "so just to clarify if they see a second membership and it's not joined through the same client and doesn't fall into the escalation/exception category then they are not to mention the second membership…and if they do, they will lose points?"[45] Her

---

[41] Vertrue document, "Connecticut Attorney General Complaint" (Jan. 14, 2009) (Vertrue Doc. 17884-17891).

[42] Internal Webloyalty document, "Quick Reference Guide - Multiple Memberships" (Oct. 2006) (Webloyalty Doc. 26564).

[43] Internal Webloyalty e-mail (July 15, 2005) (Webloyalty Doc. 73920).

[44] Webloyalty document, "Multiple Memberships" (Webloyalty Doc. 25744).

[45] Internal Webloyalty e-mail (Nov. 11, 2008) (Webloyalty Doc. 101163-101166).

colleague responded by stating, "Exactly!"; "Do I agree with that thought process – No –but it is what it is!"; and "Feels sneaky to me – especially in this economy.....$10.00 is $10.00 etc..."[46]

Vertrue's policy on multiple memberships was remarkably similar to Webloyalty's policy. Call center representatives appear to have been specifically instructed not to inform customers of additional memberships. In a "Customer Service Final Exam" for call center representatives, Vertrue showed call center representatives the following screenshot that could appear on their monitor when receiving a call from a customer:

Figure 1

The screenshot shows that "Joseph Smith" is enrolled in seven membership programs offered by Vertrue. A question for call center representatives asks, if the customer calls to cancel one of the programs, should "you mention all other memberships during your call?"[47] The answer key states, "No."[48]

In 2007, Vistaprint, one of Vertrue's most profitable online partners, asked Vertrue to change how it disclosed multiple memberships to Vistaprint's customers. Instead of canceling members according to Vertrue's standard stop bill cancelation policy, Vistaprint requested that, "[w]hen a customer calls to cancel a program, we would like to make the customer aware of any other programs they have signed up for, so they can cancel all at once."[49]

In determining the financial implications of this policy change, Vertrue executives compiled information related to Vistaprint customers who, like Ms. Morgan of New Mexico, had multiple memberships in Vertrue programs. Of the 105,299 Vistaprint customers who were enrolled in a Vertrue program between August 2006 and October 2006, over 20,000, or 20

---

[46] *Id.*

[47] Vertrue document, "Customer Service Final Exam - Answer" (July 15, 2008) (Vertrue Doc. 431-437).

[48] *Id.*

[49] E-mail from Vistaprint Marketing Associate to a Vertrue Director of Client Services (Mar. 23, 2007) (Vertrue Doc. 110066-110068).

percent, were enrolled in more than one Vertrue program. During those three months, nearly 4,000 Vistaprint customers were enrolled in more than three Vertrue programs.[50]

In an e-mail to Vistaprint, Vertrue's Director of Client Services wrote, "A change in the cancel policy in which we informed members of additional products and provided refunds for the second product (as we need to expect the member would request) would impact our margins by 9.2%."[51] Consequently, Vertue only agreed to make the change in its multiple membership policy after Vistaprint agreed to a reduction in the payments Vertrue made to Vistaprint.[52]

Affinion apparently took a more consumer-friendly approach than either Webloyalty or Vertrue, although its practice was still problematic. In an e-mail to one of Affinion's partners, Affinion's Vice President of Relationship Management informed the partner that its practice was to "purge the membership database of dupes every 6 months" because "it is not a good customer practice" to have a member billed for multiple membership programs, especially "when there is so much overlap between the programs."[53] Although it cancelled duplicate memberships semi-annually, it appears Affinion made no effort to refund improper charges to those customers who had enrolled in multiple membership programs.

### B. "Damage Control"

Affinion, Vertrue, and Webloyalty went to great lengths to minimize the amount of improper charges they returned to angry consumers. But they also understood that if they did not sufficiently appease the millions of dissatisfied consumers who called them every year, they would subject themselves to unwanted scrutiny from consumer advocates, law enforcement officials, and the media. As was discussed in the November Staff Report, Affinion, Vertrue, and Webloyalty also knew that if the "customer noise" levels grew too loud, their online partners would start questioning whether they should be doing business with the three companies.[54]

Consumers who remained unsatisfied with the three companies' cancelation and/or refund offers could cause serious problems for Affinion, Vertrue, and Webloyalty. Improperly handled calls from these so-called "irates" could result in bank and attorney general investigations, negative blogposts, and reputational damage to the three companies' business partners. As one Affinion executive observed in an internal e-mail, "If an irate calls in, we just have one real-time opportunity to diffuse them and solve their problem there and then – before it results in client calls, or regulatory complaints."[55]

---

[50] E-mail from Vertrue Director of Client Services to Vistaprint Marketing Associate (Apr. 25, 2007) (Vertrue Doc. 40355).

[51] Id.

[52] E-mail from Vertrue Director of Client Services to Vistaprint Marketing Associate (Sep. 15, 2008) (Vertrue Doc. 45253).

[53] E-mail from Affinion Vice President Relationship Management to 1800Flowers.com employee (Dec. 17, 2007) (Affinion Doc. AFSE 05-3750).

[54] November Staff Report, 24-26.

[55] Internal Affinion e-mail (Nov. 7, 2008) (Affinion Doc. AFSE-04-3767).

14

One case examined by Committee staff involving an angry AirTran customer illustrates how much trouble "irate" consumers could cause for the three companies if they complained directly to the online partner. In June 2008, a Connecticut consumer, Mrs. W., inadvertently signed up for an Affinion membership club called Great Fun as she was purchasing an airplane ticket on the AirTran website. Mrs. W. and her husband, a retired business executive, noticed the Great Fun charges on their credit card statement within a few months.[56]

On October 15, 2008, Mr. W. called the 800 number listed next to Great Fun on their credit card bill to find out what the charges were. According to Mr. W. and to Affinion's subsequent review of the matter, Mr. W. was connected to an Affinion representative in Manila, Philippines. He asked several questions about the charges and then demanded that Affinion refund the three monthly charges Great Fun had made to the credit card. During the conversation, the agent in Manila apparently told Mr. W. that the Great Fun charges were connected to the June AirTran purchase.[57] The agent also attempted to "save" the membership by offering a "rebuttal" to Mr. W. According to Affinion's description of the call:

> The member [Mr. W.] asked several questions regarding what the service is and how they were enrolled. The agent answered all of these questions (the member over-powered the agent). At one point the member stated that this was fraudulent and he wanted his 3 charges refunded. At this point, the agent made one rebuttal, "Do you want to give this a try at all?" This was the agent's poor judgment in attempting any pitch to retain the member…she should have moved directly to cancelling the membership.[58]

After Mr. W. refused the agent's offer to give the Great Fun membership a try, the agent informed him that he would have to send in a written request for the refund. According to Affinion's description of this conversation, "this is when the member mentioned getting an attorney involved," and Mr. W. was "escalated" to a more experienced agent working in Affinion's Ohio Support Center.[59] As another Affinion official described the situation, "The customer became increasingly irate and was then transferred to our support desk (our highest level representative) located in Westerville, Ohio."[60] The representative in Ohio cancelled Mr. W.'s membership and issued him a complete refund. During this conversation, Mr. W. said the agent had presented another "rebuttal" to his request.

While Mr. W. received a full refund, he was still angry. After conducting online research about Affinion and Great Fun, he decided to make AirTran aware of his experience. Mr. W. contacted the office of AirTran CEO Robert Fornaro to lodge a complaint. According to a senior

---

[56] Committee staff interviewed one of the consumers involved in this case, Mr. W. He corroborated the facts presented in the Affinion documents reviewed in this section, but requested that Committee staff not release his or his wife's name.

[57] Mr. W. told Committee staff it is possible he first learned of the connection between the Great Fun charges and his AirTran purchase during a conversation with his credit card company.

[58] Internal Affinion e-mail (Oct. 23, 2008) (Affinion Doc. AFSE-04-3706).

[59] Id.

[60] Internal Affinion e-mail (Oct. 23, 2008) (Affinion Doc. AFSE-04-3693).

AirTran marketing official who spoke with him, Mr. W. asked "how AirTran could allow itself to be associated with Great Fun and such a process."[61]  According to an internal Affinion e-mail, Mr. W.'s complaint "did the rounds" in AirTran's executive offices: "Everyone saw it from their Chairman to legal.  Not good."[62]

After speaking with Mr. W., the AirTran marketing official wrote an e-mail to his Affinion contacts asking for an explanation of the incident.  In particular, he wanted to know why Affinion had apparently violated its agreement to attempt only one "rebuttal" per cancelling AirTran customer.  The official wrote:

> This is totally unacceptable and not how we want our customers treated!  Section 6(a) of the contract we executed…clearly states that if a customer desires to cancel their membership that Affinion…will provide a maximum of 1 explanation of the benefits and if the customer elects to proceed with cancelation it will be processed immediately. That is clearly not what happened in this situation.  I question how many of our customers are subjected to this type of treatment if they decide to cancel the program.[63]

Over the next few days, Affinion officials investigated the incident and discussed doing "damage control" with AirTran.  One official observed that AirTran was an "extremely strict and risk averse client" that had "required us to commit in the contract to one rebuttal for the purpose of avoiding customer noise."  She also noted that "all new initiatives are on hold with this partner [AirTran] until we have addressed this to their satisfaction."[64]  When Affinion offered to call Mr. W. to talk to him about the incident, the AirTran official responded:

> Please use extreme care…he is extremely anxious about you having his CC [credit card] info and contact information.  He researched Affinion/Trilegiant and gave me a full run down on the legal problems that Affinion has had in the past with banks.[65]

In spite of incidents like this one, in which e-commerce companies like AirTran were clearly made aware of the aggressive tactics the three Connecticut companies were using against their customers, hundreds of reputable online companies continued to partner with Affinion, Vertrue, and Webloyalty and pass their customers' billing information on to the three companies in exchange for a share of the profits.  Before AirTran decided to cancel its contract with Affinion following the Committee's November hearing, it had earned almost $3 million since entering into a partnership with Affinion in early 2008.

---

[61]  E-mail from AirTran Marketing Executive to Affinion Group Vice President (Oct. 21, 2008) (Affinion Doc. AFSE 04-3694).

[62]  Internal Affinion e-mail (Oct. 24, 2008) (Affinion Doc. AFSE-04-3704).

[63]  E-mail from AirTran Marketing Executive to Affinion Group Vice President (Oct. 21, 2008) (Affinion Doc. AFSE-04-3694).

[64]  Internal Affinion e-mail (Oct. 23, 2008) (Affinion Doc. AFSE-04-3705).

[65]  E-mail from AirTran Marketing Executive to Affinion Senior Client Manager (Oct. 22, 2008) (Affinion Doc. AFSE-04-4376).

## IV.    The Role of Credit Card Companies and Banks in the Post-Transaction Sales Industry

Like most e-commerce companies, Affinion, Vertrue, and Webloyalty and their web retail partners depended on the credit and debit card payment systems operated by Visa, MasterCard, and American Express to conduct business. Each of these credit card networks has an extensive set of rules about how merchants must conduct themselves when accepting Visa, MasterCard or American Express transactions. Each of the credit card networks also has a fraud monitoring program, aimed at identifying and preventing fraudulent merchants from accepting Visa, MasterCard, or American Express transactions.

Evidence the Committee received from Visa, MasterCard, and American Express shows that the data pass process and other practices employed by Affinion, Vertrue, Webloyalty and their e-commerce partners violated the credit card companies' operating rules and generated high volumes of customer complaints. Each of the companies has triggered fraud warning or fraud monitoring procedures within Visa, MasterCard, or American Express. Yet, in spite of significant evidence that the three companies' business practices did not meet the credit card systems' standards, Affinion, Vertrue, and Webloyalty maintained access to the credit card systems and processed millions of questionable credit and debit charges through these systems every month. Visa, MasterCard, and American Express only took decisive action against the three Connecticut companies after Chairman Rockefeller brought the issue to their attention in December 2009.

This section reviews the various credit card "merchant's rules" that Affinion, Vertrue, and Webloyalty did not follow. It also describes some of the techniques the three companies used to minimize the negative feedback that consumers provided to their credit card companies about Affinion, Vertrue, and Webloyalty. Hundreds of thousands of consumers contacted their banks and credit card companies each year complaining about fraudulent charges by Affinion, Vertrue, and Webloyalty. But because the three companies were able to contain the volume of complaints to levels the credit card companies deemed reasonable, and because the credit card companies did not vigorously enforce their own rules, Affinion, Vertrue, and Webloyalty were able to charge millions of consumers monthly fees that the consumers had not authorized.

### A.    Credit Card Company Rules for Merchants

American Express, MasterCard, and Visa have long-established rules for merchants who accept their credit cards. They have even more specific rules for merchants who charge consumers' credit cards through "card-not-present" transactions, which are transactions, like online transactions, where the merchant does not physically handle the credit card. In response to Committee requests for information about these rules, MasterCard and Visa acknowledged that the practices of Affinion, Vertrue, and Webloyalty violated a number of their general rules for merchants or their specific rules for card-not-present transactions.

MasterCard informed the Committee that the companies violated MasterCard Rule 5.10.2, which states, "A Merchant must not request or use Card account number or personal Cardholder information for any purpose that it knows or should have known to be fraudulent or

in violation of the Standards, or for any purpose that the Cardholder did not authorize."[66]   In response to the Committee's letter, MasterCard confirmed that Affinion, Vertrue, and Webloyalty "ceased receiving" or "will cease to receive" MasterCard payment card account numbers or MasterCard payment card information from third parties.[67]

Visa informed the Committee that Affinion, Vertrue, and Webloyalty failed to comply with four different Visa U.S.A. Operating Regulations that require adequate disclosure to cardholders.[68]  Following receipt of the Committee's December 8, 2009, letter, Visa notified Affinion, Vertrue, and Webloyalty's acquiring banks that they "will be subject to fines" if they fail to remedy the violations.  Visa also informed the Committee that it was proposing clarifications to its Operating Regulations to address situations where merchants have marketing relationships with third party firms.[69]  In April 2010, Visa finalized its rule, which clearly prohibits the marketing practices that Affinion, Vertrue, and Webloyalty had employed.[70]

In response to the Committee's requests, American Express did not explicitly state whether Affinion, Vertrue, or Webloyalty were in compliance with its rules.  It did provide that:

> American Express further understands that e-commerce merchants that have partnered with Affinion, Vertrue, and Webloyalty do not transfer Cardmember information to those companies without first obtaining the Cardmember's express prior consent.

American Express' view that consumers were providing express prior consent for merchants to transfer their billing information to Affinion, Vertrue, and Webloyalty is not consistent with the evidence obtained by the Committee in the course of its investigation.  American Express did note, however, that: "Regardless of whether these merchants have met American Express's requirements for Card Not Present Charges, they are immediately charged-back for all disputed Card Not Present Charges" because American Express had already placed Affinion, Vertrue, and Webloyalty in its chargeback monitoring program.[71]

### B. Chargebacks vs. Refunds

As discussed above, Affinion, Vertrue, and Webloyalty were constantly balancing their financial interest in limiting the refunds they paid to angry consumers with their interest in limiting the reputational damage that "irate" consumers could cause by complaining to the three companies' business partners, or to outside entities like consumer groups or law enforcement.

---

[66] Letter from Mr. Shawn Miles, Group Head, Global Public Policy and Regulatory Strategy Counsel, MasterCard Worldwide, to Chairman John D. Rockefeller IV (Jan. 15, 2010).

[67] Id.

[68] Letter from Mr. Alejandro Estrada, Head of Risk - The Americas, Visa, Inc., to Chairman John D. Rockefeller IV (Feb. 1, 2010).

[69] Id.

[70] Visa, Inc., *Visa Helps Protect Consumers from Deceptive Marketing* (Apr. 27, 2010).

[71] Letter from Mr. Houman Motaharian, Chief Credit Officer, Global Merchant Services, American Express Travel Related Services Company, Inc., to Chairman John D. Rockefeller IV (Dec. 21, 2009).

Angry, dissatisfied consumers could also create problems for the three companies by complaining to their credit card companies or to the banks that issued their credit cards.

The three companies were particularly concerned that angry consumers would call their credit card issuer and request that the bank return (or "chargeback") the fee that Affinion, Vertrue, or Webloyalty had charged their debit or credit card. Credit card companies carefully monitor merchants' chargeback rates for evidence of fraudulent behavior. Elevated chargeback rates indicate to a bank or credit card company that many cardholders are unhappy with a merchant's conduct, either because the merchant is not delivering the promised goods or services or because the merchant is charging consumers' cards without their authorization. Credit card companies put such merchants in special "chargeback monitoring programs" and can prohibit merchants with persistently high chargeback rates from processing payments in their system.

According to information reviewed by Committee staff, elevated chargeback rates have been an ongoing problem for Affinion, Vertrue, and Webloyalty. The credit card companies have issued warnings to the companies for their elevated chargeback rates and, in some instances, have placed them in chargeback monitoring programs. As early as 2002, Webloyalty was evaluating "chargeback action steps" that would encourage consumers to call Webloyalty directly for cancelations and refunds, rather than call their banks.[72]

When Webloyalty surveyed approximately 200 consumers who had executed chargebacks, the consumers said they had called their banks because they did not recognize Webloyalty's charges on their bill and did not think they had joined Webloyalty's clubs. When Webloyalty asked these consumers "what we could have done so they would not have contacted their provider," 28% of the consumers responded "not have billed me: this is a scam/not clear how they got my billing information."[73]

The challenges Affinion, Vertrue, and Webloyalty faced with chargebacks is reflected in the information the credit card companies provided to the Committee. In response to the Committee's requests about chargebacks, American Express, MasterCard, and Visa each provided the following:

- American Express "maintains a monitoring program to identify and investigate U.S. merchants with excessive dispute rates to assess whether they may be engaging in fraudulent, deceptive, or unfair sales practices with consumers"[74] At different points, American Express placed Affinion, Vertrue, and Webloyalty in its chargeback monitoring program and each "remain in the program to date." From 2005 through 2009, no more than 0.04% of all merchants accepting American Express cards were placed within the program.[75]

---

[72] Internal Webloyalty e-mail (Oct. 1, 2002) (Webloyalty Doc. 103427).

[73] *Id.*

[74] Letter from Mr. Houman Motaharian, Chief Credit Officer, Global Merchant Services, American Express Travel Related Services Company, Inc., to Chairman John D. Rockefeller IV (Dec. 21, 2009).

[75] *Id.*

- MasterCard placed Webloyalty in its Excessive Chargeback Program on a number of occasions. In 2008 and 2009, Webloyalty's discount programs caused it to be labeled as an "Excessive Chargeback Merchant" on two occasions and it has been labeled as a "Chargeback Monitored Merchant" due to its membership programs on seven occasions.[76] Only 0.02% of merchants are designated as "Excessive Chargeback Merchants" in a given year.[77]

- Visa did not place Affinion, Vertrue or Webloyalty in its Merchant Chargeback Monitoring Program, but "there were two instances (2006 and 2009) where the subjects received warning identifications" by the program.[78]

To contain the rate of chargebacks, Affinion, Vertrue, and Webloyalty sought to refund angry consumers' charges before they complained to their credit card companies or issuing banks. While a consumer refund paid through the chargeback process triggered credit card companies' fraud monitoring systems, a refund paid directly to the consumer by Affinion, Vertrue, or Webloyalty did not. For this reason, the companies routinely instructed their call representatives to issue refunds to consumers who threatened to complain to their banks or credit card companies. They were also instructed to issue refunds when banks or credit card companies called on behalf of consumers.

Although Affinion, Vertrue, and Webloyalty issued more than 5 million refunds a year worth hundreds of millions of dollars, the companies were still subject to hundreds of thousands of chargeback requests each year. According to information submitted to the Committee, between 2006 and 2008, American Express, MasterCard, and Visa processed more than 1.4 million chargeback requests from consumers claiming they had not authorized Affinion, Vertrue, or Webloyalty to charge their credit or debit card.

## V.    Conclusion

Once they had acquired consumers' billing information and deceptively "enrolled" consumers in their "negative option" membership clubs, Affinion, Vetrue, and Webloyalty made money as long as consumers took no action. The three companies charged consumers month after month for services that consumers did not use and did not understand they had purchased. When consumers finally realized that the three companies were charging them, Affinion, Vertrue, and Webloyalty withheld important information about the charges from consumers and made it as difficult as possible for consumers to get their money back. This abusive "post-transaction" sales industry was able to flourish because reputable websites were willing to share

---

[76] Letter from Mr. Shawn Miles, Global Public Policy and Regulatory Strategy Counsel for MasterCard, to Chairman John D. Rockefeller IV (Jan. 15, 2010).

[77] Id.

[78] Letter from Mr. Alejandro Estrada, Head of Risk - The Americas, Visa, Inc., to Chairman John D. Rockefeller IV (Dec. 22, 2009).

their customers' billing information with Affinion, Vertrue, and Webloyalty, and because the credit card systems processed millions of the three companies' unauthorized charges.

# Document

# #5

**From:**
**Sent:** Tuesday, October 01, 2002 3:59 PM
**To:** Rick Fernandes;
**Cc:**
**Subject:** Chargeback Action Steps

*[handwritten notes in right margin:]* Bill in errors? Limit worse chargebacks. 2 step Jon process - are you sure?

## We agreed to implement the following:

- Increase Branding. Review current solicitations, email communication streams and websites to ensure branding is clear. Do all from lines use the product name? Are all site headers very clearly using the correct branding (eg., old classmates sites may not be correct).
- Test more prominent mention of billing descriptors across communication stream. In particular, ensure pre-bill is clear. Test a shortened version of the pre-bill email that strictly functions as a prebill notice -- and not a benefit reminder notice. Sell page, acknowledgement page, join email, billing reminder, FAQ's. WLI SERVICE NAME.
- Test Offline fulfillment. Create and deliver a #10 letter w/card. ███ to review sample size requirements to ensure a "chargeback" read. The Cancelation read will require a minimum of 2500 joins for each test cell. Likely will target cmates TVP new join populations. *Test offline billing reminder policies*
- Cancel Module -- Easy Access. Upon completion, cancel module links will be referenced in phone room closed messages, website customer service/FAQ sections and in a large set of prebill emails (not all -- we will test aggressively -- and watch closely for cancel rate impact).
- Negative File -- in house data. ███ has prioritized on his systems list. Need to specifically review previous "negative file" criteria when ███ is ready to apply resources. In the past we defined this list as any user who has charged us back -- plus any user that has recently cancelled one of our services (potential gamer).
- Negative File -- external list. Goal is to screen our new join list against known chargeback consumers. Information available at www.paymentresource.com/fraudprotection.asp
- Test if chargeback consumers have a valid email address. Take recent users that charged-back and send them an email to see if it bounces back. We should request basic information that a recipient can simply respond to via email -- why did you call your bank to charge back this charge instead of calling us directly?
- Expedite ongoing communication streams to drive activation. Review: did upgrade strategy w/cmates have any impact? *L. monthly* *Letters at cmates home* *[handwritten: ● Notify cmates - Billing address - Add billing and extgerned to cc collection]*
- Test: Assign password on sell page
- Test: 2 Step COF confirmation. Are you sure?
- Test: Price point in audio
- Test: Price points, quarterly billing
- Test: Gather billing address.

## Why are users charging back?

- Survey data
- Are chargeback users being sent an offline fulfillment piece (eg., is there email any good?)

Unfortunately, there is no silver bullet. We need to improve on several fronts. Our original hypotheses why customers were charging back:

- Most chargebacks are happening on debit cards, not credit cards. False. 75% of chargebacks were from a credit card
- Online access causing problems. Probably; but not the big issue. 34% of all chargebacks were initiated by users finding the charge either online or by checking their account w/their bank over the phone. 80% of the debit card chargebacks identified the charge in this method. 20% of the credit card chargebacks identified the charge. At the end of the day, 60% of all of our chargebacks came from users with credit cards that identified the charge from the standard monthly billing statement
- Many chargebacks are caused by inadequate billing descriptors. False. It's possible this is an issue for Debit card holders -- our phone number may not be easily accessible. However, 80% of the credit card chargebacks were caused by users identifying the charge on their credit card statement -- the way we intended it to happen. Bigger issue is that many users won't bother to call if they don't recognize the descriptor (and we ran confusing descriptors for a around 6 weeks or so after our move to Vital).
- Unknown branding. Significant issue. 78% of all chargebacks (same for credit and debit) claim they did not recognize the merchant name -- and their recall of our billing descriptors were pretty good (not surprisingly, since most only charged back 1 item on the statement -- thus you remember it). 20% of the chargeback users claim they recognized

1

Confidential

# Document Numbered
# 00103428
# Removed

the merchant name, but that we should not have charged them.
- Poor Customer Service. False. Only 23% (47) of the chargeback users attempted to contact us before contacting their visa/mc provider. However, of those that attempted to contact us, only 38% (18 of the 47) successfully made contact -- and of these 18, only 8 thought they received a timely response and only 3 thought that their issue was dealt with effectively.
- Fraud. Apparently a small impact. However, 13% claimed they had more than 1 fraudulent charge
- Lack of (perceived) agreement regarding continuity billing. False. Bigger issue was lack of agreement that they joined; 87% claim they do not recall signing up for the free trial. Of the 11% that did remember signing up (23 users), 30% (7 users) expected to be charged after the trial and 70% did not expect to be charged (10 users actually attempted to cancel).

Things customers said we could have done so they would not have contacted their provider:
- 28% -- not have billed me; this is a scam/not clear how they got my billing information
- 15% -- sent me info on the service/in the mail/verifying that I had signed up
- 13% -- No clue/didn't recognize the charge
- 12% -- Let me know that they were going to charge my card
- 9% -- cancelled it when they requested to do so
- 6% -- if there was a phone number on the credit card statement
- Note: Only 29% remember if our phone number was listed on their statement (same for credit card and debit card users; however, online and telephone access had a much lower rate than users that identified the charge on their monthly statements)

Of those that contacted provider w/o attempting to contact us:
- 50% -- Didn't recognize charge on the bill (worse for online access; worse yet for phone access)
- 19% -- couldn't find phone or email contact (same for credit card and debit card users)
- 15% -- Easier to contact bank

Banks are not our friends
- Only 13% required users to contact us to attempt to get the charge removed (debit card actually higher than credit card)
- However, 70% required some type of affidavit and 15% were required to cancel their credit card (and 12% of those not required to do so -- did)



204 tabs1.doc

VP Marketing, webloyalty.com
101 Merritt 7,
Norwalk, CT 06851

http://www.webloyalty.com
*We create subscription services that generate incremental revenue streams to complement your current ecommerce and advertising business strategies.*

2

WL 00103429

# Document

# #7

## Top Ten Reasons a Member Calls



1.  Cancel my membership ⟶
2.  What is this charge? ⟶    most Calls

3.  Status of Cash Back Awards/ Free Gift/ Premium

4.  Status of a Claim

5.  Unable to print membership card or coupons.

6.  Problems logging into site

7.  Overdraft Fees

8.  Coupon Issues (Reservation Rewards)

9.  Name correction – Name change

10.  Unable to enroll

CONFIDENTIAL                                                    WL-056370

**Representative Documents Produced by Affinion, Vertrue and Webloyalty and cited in Staff Report For Chairman Rockefeller**

### Part I

1. Email from Webloyalty employee to 1800Petmeds employee (Feb. 11, 2009) (Webloyalty Doc. 88550).

2. Webloyalty presentation "Revenue Continuum" (Webloyalty Doc. 27485).

3. Internal Vertrue e-mail (Jun. 23, 2009) (Vertrue Doc. 188778-84)

4. Internal Webloyalty e-mail (Oct. 21, 2008) (Webloyalty Doc. 89166-67).

### Part II

5. E-mail from Priceline call center employee to Affinion employee (June 17, 2009) (Affinion Doc. AFSE 04-1653-60).

6. Internal Webloyalty E-mail from Senior Vice President for Business Development and Account Management to Richard Fernandes, Chief Executive Officer of Webloyalty, and other Webloyalty employees (Aug. 25, 2003) (Webloyalty Doc. 14019).

7. Internal 1-800-Flowers.com email (Nov. 7, 2007) (Affinion Doc. AFSC 5-3450-54).

8. E-mail from Webloyalty partner employee to Webloyalty employees (Feb. 6, 2008) (Webloyalty Doc. 95894-95).

# DOCUMENT

# #1

From: ▓▓▓▓▓▓▓ [▓▓▓▓▓▓▓@webloyalty.com]
Sent: Wednesday, February 11, 2009 4:04 PM
To: ▓▓▓▓▓▓
Cc: ▓▓▓▓▓▓
Subject: RE: Continue Button

▓▓▓,


No worries. I appreciate you reaching out to me about the issue.
Removing the "Continue" button is more than a simple cropping task and requires that we get you a
new banner altogether. We can do that but my concern is that the program performance without the
"Continue" button will be even worse than it has been since the last change was made. With these
changes your CEO is decimating a program that delivered more than $516,000 in pure profit to you
in 2008. If you operate your web site on a 10% net profit margin, our payments to you represent
over $5 million in sales revenue. Your CEO appears to be reacting to what is truly a tiny number
of complaints relative to the number of happy customers of yours who have joined our program
(over 35,000 in 2008) and did not have complaints. Is a single complaint or two worth giving up
this profitable business?


Since you have already taken the button down, can we schedule a meeting with your CEO to discuss
this issue before putting a new button up? We think there are compelling reasons to believe that
our marketing is clear and easily understood by the vast majority of consumers. Given the
conservative elements we are introducing to our marketing in the near future, we are hopeful that
your CEO might agree. I will be traveling for the next week and a half but could be in your
offices on February 26th or 27th, right after eTail. Will that work?


▓▓▓▓▓▓▓▓▓▓

Office – ▓▓▓▓▓▓▓▓

Cell – ▓▓▓▓▓▓▓

──────

From: ▓▓▓▓▓▓ [mailto:▓▓▓@1800petmeds.com]
Sent: Wednesday, February 11, 2009 3:33 PM
To: ▓▓▓▓▓▓▓▓▓▓▓
Subject: Continue Button


Sorry to bother you with this, but ▓▓▓▓▓ is out, so you're the only contact I got.  I need you
guys to crop out the "continue" button until we can get some new creative to test.  CEO mandate.
I had to take the button down until we can crop out that grey "continue" button.........


───────────────────────

▓▓▓▓▓▓▓▓▓▓▓▓▓
1800PetMeds.com
v: ▓▓▓▓▓▓▓▓
f: ▓▓▓▓▓▓▓

CONFIDENTIAL

# DOCUMENT #2



*Revenue Continuum*

**Low $Revenue**

**High $Revenue**

Versions:
Hybrid
Checked
Pre-checked
Targeted variations

Versions:
COF (card on file)
2-Step Sols
Targeted variations

NCOF
(Non-Card on file)

**$750,000**

**$11 Million**

43

WL-027485

# DOCUMENT #3

| | |
|---|---|
| **From:** | ████████ |
| **Sent:** | Tuesday, June 23, 2009 1 14 PM (GMT) |
| **To:** | ████████████@adaptivemarketing.com>, ████████████ █@adaptivemarketing com> |
| **Cc:** | ████████████@adaptivemarketing.com>; ████████ ████████@adaptivemarketing.com>, ████████ ████@adaptivemarketing com>; ████████ ████@adaptivemarketing com>; ████████ ████@adaptivemarketing com>; ████████ ████@adaptivemarketing com> |
| **Subject:** | Fw· Satisfaction Results to Date for Membership Center site |
| **Attach:** | Open-ended Membership Center Comments on 6-22 xlsx;Suggestion Box for Membership Center.xlsx |

 - Food for thought in advance of the mtg we'll be having on this...

I think the #1 priority addition is to add messaging specifically to address 'how did I get this'. For the immediate term, we could direct visitors to a specific (new) contact us drop down selection to be used to request information/background on how they were enrolled. These requests would be a bit labor intensive as the eCSR team would have to dig, summarize and respond, but I think this is critical.

Second consideration is to revise the biz rule for cancels via this site to default to a refund of most recent monthly charge. In reading the comments, it's clear that these folks are not going to walk away satisfied and many are noting intent to escalate to banks/AG/BBB, etc. In the long run, that's going to be much more costly than the hit to revenue.



| | |
|---|---|
| **From:** | ████████ |
| **To:** | ████████████████████████████ |

**Sent:** Mon Jun 22 10:10:10 2009
**Subject:** Satisfaction Results to Date for Membership Center site

67% of the respondents were dissatisfied.

The good news is that only 28% of the respondents found it difficult to get their member id.

Please see the attached files of open-ended responses. These include Questions 3 and 5 below.

CONFIDENTIAL & PROPRIETARY· FOR COMMITTEE EYES ONLY

VERTRUE-0118778

**1.** What was your primary reason for visiting the Membership Center site?

| | | | |
|---|---|---|---|
| To find out about the charge on my credit card that I did not recognize. | | 37 | 43% |
| To find out more about my membership benefits. | | 1 | 1% |
| To cancel the program. | | 38 | 44% |
| To obtain my Member ID. | | 0 | 0% |
| Other, please specify View Responses | | 10 | 12% |
| | Total | 86 | 100% |

**2.** Please rate your satisfaction with the Membership Center website.

| | | | |
|---|---|---|---|
| Extremely satisfied | | 2 | 2% |
| Satisfied | | 8 | 9% |
| Neither satisfied nor dissatisfied | | 18 | 21% |
| Dissatisfied | | 6 | 7% |
| Extremely dissatisfied | | 52 | 60% |
| | Total | 86 | 100% |

**3.** Why do you say that?

View 54 Responses

**4.** Please rate the ease of obtaining your Member ID?

| | | | |
|---|---|---|---|
| Extremely easy | | 13 | 15% |
| Easy | | 21 | 24% |
| Neither easy or difficult | | 28 | 33% |
| Difficult | | 5 | 6% |
| Extremely difficult | | 19 | 22% |
| | Total | 86 | 100% |

**5.** SUGGESTION BOX Are there any additional features that you would like to see on MembershipCenter.com? How can w serve you better?

View 50 Responses

CONFIDENTIAL & PROPRIETARY- FOR COMMITTEE EYES ONLY

VERTRUE-0118779



CONFIDENTIAL & PROPRIETARY- FOR COMMITTEE EYES ONLY

| | A | B | C | D |
|---|---|---|---|---|
| 1 | 3. Why do you say that? | | | |
| 2 | # | Response | | |
| 3 | 1 | This charge as well as others appeared out of no where | | |
| 4 | | I cancelled my membership by phone a week and a half ago, and still for some reason I got charged twenty dollars. | | |
| 5 | | Don't know how I got it. I don't use it, I don't want it. you've related money from me for several months for something that I have no idea what it is and will never use it, so I'm cutting you off, | | |
| | 3 | both here and at my bank! | | |
| 5 | 4 | I was charged without knowing that I was being charged. | | |
| 6 | 5 | I never signed up to be a member. I just seen money being taken out from this website without me ever knowing about it, so I canceled ASAP............ | | |
| 7 | | | | |
| 8 | | | | |
| 9 | 6 | because you are scammers back dooring people who dont catch it | | |
| 10 | 7 | too much money | | |
| 11 | 8 | Because I didn't authorize this service or know how my card # was gotten | | |
| 12 | 9 | because I do not know why am I being charged on a service that I didn't buy | | |
| 13 | 10 | I never signed up for this program! | | |
| 14 | | I have not agreed to this and dont know who | | |
| 15 | 11 | done this, this is illegal I want my money back | | |
| 16 | 12 | Hard to magovie | | |
| 17 | 13 | I didn't feel comfortable putting my info in. There should be a phone number to call customer service. Also this is unauthorized by me so it asses me off pretty bad!! | | |
| 18 | 14 | I find that these sign-up tactics are fraudulent. I did not order any service from this company. | | |
| 19 | 15 | because I HAVE A CHARGE IN MY DEBIT CARD, | | |
| 20 | 16 | because it was completely a scam that I was enrolled in this program without my consent and confirmation. You are completely violating all rights to automatically enroll me in this | | |
| 21 | | | | |
| 22 | 17 | I didn't know I was member until I took 19.95 out of my account, would like a refund | | |
| 23 | 18 | I emailed your company to see if I would be charged, and recevied no reply. Elshonest business is no way to operate. | | |
| 24 | 19 | do not like that list of charges showing up on my account that I didn't know were going to | | |
| 25 | 20 | I do not know how I was singed up for the program and there was a debit from my account. | | |
| 26 | 21 | I did not authorize this program now I have to waste my time disputing the charge. Site offers no refund option. Will be reported to authorities. | | |
| 27 | 22 | Did not sign up for membership | | |
| 28 | 23 | I was macharged for the use of this program. | | |
| 29 | 24 | because you charged me for some BOGUS service | | |
| 30 | | | | |
| 31 | 25 | You stole money from my account with no permission I Never signed up for this. I want a refund of my money I have filed charges against your company!! Your a fraud !!! | | |
| 32 | 26 | I never joined in the first place & want my money return | | |
| 33 | 27 | I did not subscribe to this program and it took several tries to locate the correct site to cancel this membership | | |
| 34 | 28 | because i didnt know i would be charged $29.95 to my account | | |
| 35 | 29 | I was charged for this program after I already spent a 10 minute phone call the day after I accidentaly enrolled, to cancel this | | |
| 36 | 30 | I did not realize I had signed up for this until I was charged and I want a FULL refund. | | |
| 37 | | I didn't authorize you to take money from my account. I did a reverse lookup on a cell phone number and paid a one time fee. I did not enroll in your program. I want the $19.95 returned to | | |
| 37 | 31 | my account now. | | |
| 38 | | because my account was charged even though I had cancelled my account directly after signing in. I have never used your services and I was charged $1.00 in the beginning for my opening | | |
| 39 | 32 | enquiry which I understand but then after I never recieving anything immediatley I cenceled my account and some twenty days later im charged $30.00. This is misrepresentation and in my | | |
| 40 | 33 | I never willingly joined, I want a reimbursement. I have never even heard of you. | | |
| 41 | 34 | You're a scam, pure and simple. Charges began appearing on my card without my clear authorization after using litle/us, also a scam. | | |
| 42 | 35 | I have no idea why you charged me 19.95. Where did you got my debit card information? I have no recollection of doing business with wajmak. | | |

CONFIDENTIAL & PROPRIETARY- FOR COMMITTEE EYES ONLY

VERTRUE-0118781

| | A | B | C | D |
|---|---|---|---|---|
| 43 | 36 | This appears to be a scam and I was billed $19.95 (three days ago) and I have no idea how you received my information. | | |
| 44 | 37 | I didn't sing up for this, I've been charged $60 that I didn't know about | | |
| 45 | 38 | I NEVER AUTHORIZED A CHARGE ON MY ACCOUNT FOR THIS! I WANT THE CHARGE REMOVED FROM MY ACCOUNT IMMEDIATELY OR I WILL SEEK LEGAL ACTION! | | |
| 46 | 39 | You were stealing money from me. | | |
| 47 | 40 | This is a scam...didn't even sign up | | |
| 48 | 41 | You charged my account without my consent or knowledge. | | |
| 49 | 42 | u tried to take my money and cost me an over draft fee u fucks like times aren't hard enough. im reporting u to the BBB | | |
| 50 | 43 | I did not authorize your company at all to charge my credit card. I have contacted my back and others to report this company as a scam. | | |
| 51 | 44 | I didn't want the program | | |
| 52 | 45 | I NEVER ENROLLED. I would never pay for such a bogus 3rd party tracking of my credit. | | |
| 53 | 46 | Navigation of the sight was not easy. | | |
| 54 | 47 | Because I never will sing a sign up for this and you will refund 19.95, because I never agreed to this. | | |
| 55 | 48 | There is not phone number to actually CONTACT the marketing company so that I might find out how and why I have been billed for this program. | | |
| 56 | 49 | because I dont even know how the fuck I signed up for this shit and the company is very sneaky and horrible. | | |
| 57 | | I do not know how in the world I accepted | | |
| 58 | | to have this charge on my credit card. | | |
| 59 | | Please do not charge my any more. | | |
| 60 | | I am extremely not pleased by the way this | | |
| 61 | 50 | charge was put on my credit card. | | |
| 62 | 51 | I am extremely dissatisfied service that I was supposedly signed up for was never made known to me except by sneaky charging my credit card in what can only be a hope that I wouldn't notice. To say I<br>this supposed service would be a major understatement. I am disgusted. | | |
| 62 | 52 | I cancelled my membership and yet I still got charged | | |
| 63 | 53 | I did not order this program...and if I did I was tricked into ordering it when I made a purchas | | |
| 64 | | | | |
| 65 | 54 | THIS IS A HUGE RIP OFF-I DID NOT KNOWINGLY AGREE TO THIS CHARGE, AND WHEN I FOUND OUT HOW I GOT THIS CHARGE I WILL CONTACT THE INDIANA ATTORNEY GENERALS OFFICE. | | |

CONFIDENTIAL & PROPRIETARY: FOR COMMITTEE EYES ONLY

VERITRUE-0118782

| A | B | C | D |
|---|---|---|---|
| 1 | S. SUGGESTION BOX   Are there any additional features that you would like to see on MembershipCenter.com? How can we serve you better? | | |
| 2 | # Response | | |
| 3 | 1 this is a test | | |
| 4 | 2 Please refund my membership fee because I did not sign up for this website and it serves as no value to me. | | |
| 5 | 3 Yeah, if a customer speaks to a customer service representative and they tell them that their membership has been cancelled...CANCEL IT! | | |
| 6 | 4 Refund all the money you've stolen from me! I don't ever take money from me again!!! | | |
| 7 | 5 N/A | | |
| 8 | 6 dont subscribe people that dont subscribe. no emails were ever sent, therefore, scam. | | |
| 9 | 7 no | | |
| 10 | 8 Your like seeing the coupons before the bill would be nice. | | |
| 11 | 9 stop charging people credit/debit card without them knowing it. it's crucial | | |
| 12 | 10 yes, you need better security. someone used my id to sign up for this site. | | |
| 13 | 10 serve me better by getting me my money back. | | |
| 14 | 11 stop taking money without permission | | |
| 15 | 12 I didn't know what this charge was or where it come from. I am upset for the charge. | | |
| 16 | 13 PHONE NUMBERS!!!!!!!!!!!!! | | |
| 17 | 14 Do not secretly sign people up for your service. | | |
| 18 | 15 quit automatically taking advantage of people and I also want my damn money back!!!!! | | |
| 19 | 16 more education prior to us taking money out f my checking account. | | |
| 20 | 17 don't lie about the fee!!!!!!!!!! | | |
| 21 | 18 not just take peoples money without acknowledgement | | |
| 22 | 19 Please discenroll me from the program | | |
| 23 | 20 no you all were great! Actually I might use you again soon, however right right now. | | |
| 24 | I had no idea I was enrolling / enrolled. Can not think of how this happened short of identity theft. Expecting refund to my debit card - will be contacting attorney | | |
| 24 | 21 general if not reversed immediately. | | |
| 25 | 22 nothing | | |
| 26 | 23 I didn't know I'd even signed up for this?? | | |
| 27 | 24 I want my 99 dollars back | | |
| 28 | 25 REFUND MY MONEY !!!!! IM FILING CHARGES | | |
| 29 | 26 Do not start billing a person without them knowing it. | | |
| 30 | 27 Return my money & explain how you got into my checking account | | |
| 31 | 28 Don't get your members by other companies. | | |
| 32 | 29 let someone know ahead of time before they'd be charged... | | |
| 33 | 30 Make sure your staff follows up, I was told I would never be charged a dime and it was debited from my account anyway | | |
| 34 | 31 Clearly state how to be refunded | | |
| 35 | 32 no | | |
| 36 | 33 Give the people you steal from their money back. | | |
| 37 | 34 Reimburse me! | | |
| | You can help us all by drowning in a pool of shit. I'm sure I clicked on something which, technically, gave your permission to steal $19.95 a month from me. But, | | |
| 38 | 35 your business practices stink as evidenced by the complaints against you and Intelius. Shame on you! | | |
| 39 | 36 Who are you? Please respond as I plan to take this matter up with my bank. | | |
| 40 | 37 I'd like my account to be reimbursed the $19.95 I was charged. | | |
| 41 | | | |
| 42 | 38 How did you get my information and credit card information. How do I get my money back? | | |

CONFIDENTIAL & PROPRIETARY: FOR COMMITTEE EYES ONLY

VERITRUE-011876

| A | B | C | D |
|---|---|---|---|
| | I dont remember ever signing up for this so you could really not be sneaky about your memberships. I dont appreciate having random charges on my card | | |
| 38 | Obviously this is your intention if you have it as an option for why people come to the site. | | |
| 40 | I would like to see you arrested for stealing peoples money | | |
| 41 | maybe u should warn people first next time u want to fuck me kiss me first | | |
| 42 | Easy yes. So easy I never signed up for it. | | |
| 43 | You can stop fucking being deceptive and go out of business you snaking fucks. | | |
| 44 | Phone numbers | | |
| | because I did not even know I had it until the bullshit charge was added to me account. You can better serve me by placing the 14.95 you STOLE from me and | | |
| 49 | placing it back into my account. | | |
| 50 | there's nothing good about finding holster, miscellaneous charges for products or services you neither wanted, selected or used. | | |
| 51 | I do not see why I could get a receipt for | | |
| 52 | the $19.95 I was charged. | | |
| 53 | Stop tricking people into your phony service | | |
| | EASY WHAT A JOKE | | |
| 54 | This is not something I authorized or joined. This is a scam and should not exist. | | |
| 56 | Will the charge be refunded, or do we need to contact our credit card with a complaint | | |

CONFIDENTIAL & PROPRIETARY- FOR COMMITTEE EYES ONLY

VERITRUE-0118784

# DOCUMENT

# #4

From: ▓▓▓▓▓▓▓ (▓▓▓▓▓▓▓@webloyalty.com]
Sent: Tuesday, October 21, 2008 8:28 PM
To: ▓▓▓▓▓▓▓
Subject: FW: scripts and changes


From: ▓▓▓▓▓▓▓
Sent: Tuesday, October 21, 2008 9:18 PM
To: ▓▓▓▓▓▓▓▓▓▓
Subject: FW: scripts and changes


From: ▓▓▓▓▓▓▓ [mailto:▓▓▓▓▓▓▓▓▓▓▓]
Sent: Tuesday, October 21, 2008 4:01 PM
To: ▓▓▓▓▓▓▓▓
Subject: scripts and changes


Standard opening:


I understand, what I can do is look up the information and give you a brief description
of what that charge/email represents and then you can tell me what you would like me to
do. May I please have the spelling of your last name and zip code?


Explanation: By eliminating I can help you with that you are acknowledging what they said
but not saying you will be doing what their initial request was.

By asking for the spelling of their name, it is easier to understand.
Also the spelling could be different than the pronunciation of the name.


Requesting the reason the member is canceling the membership:


Explanation: This should be asked at the end, of the call.

At least 90% of our members don't know anything about the membership and asking this
question just makes them mad. If they haven't given the reason themselves during the
call, then it would be appropriate to ask.
Also this is a iffy question even the members who are polite and calm during the call can
get very upset when asked.


CONFIDENTIAL                                                                    WL-00089166

All COF / NCOF offers:

I would like to see  (special reward) removed from the explanation of the offer. This promotional (or) incentive offer included access to these benefits Etc....

Member responses are usually what reward you promise a coupon for $10.00, that I never received and charge me $12.00. What kind of reward is that???????

Stop Bill:

When we state "I show the last charge was on this (date)" most people do not hear this or pay attention to what we're saying. if the charge they see  is not the last charge showing on their statement it will cause them to call us back when they get their next statement..

They believe we've lied to them. The usual member response is I called last month and you promised to cancel the membership and you promised a refund and I have a credit for $$$ and you charged me again.

Then you have to explain they were looking at the previous month bank or credit card statement. The charge was already processed.

My suggestion is ask them if that is the charge their seeing on their statement, if it is all is good. But if it isn't you can say that charge will be on the next statement, at least their aware of the charge and maybe it will eliminate some of the call backs.

I show the last charge was on (date) is that what your seeing. If they say yes just go on with the stop bill. If not

Insert: this charge will appear on your next statement. They may ask for this charge back but they probably will not be calling us back next month.

A large percentage of our calls derive from these calls. Speaking to others on the floor they think 40% - 50% of our calls are canceled members see a new charge on their account.

I believe this would reduce our call backs by a significant amount.

CONFIDENTIAL

WL-00089167

**Supplemental Report on Aggressive Sales Tactics on the Internet**
**List of Released Documents**
**May 19, 2010**

1.  Internal Affinion e-mail between three Affinion employees describing consumer "escalation" and refund process (Oct. 31, 2008) (Affinion Doc. AFSE-04-3749 – AFSE-04-3750).

2.  Internal Vertrue document "Customer Care Representative Evaluation Criteria, Appendix A – Enforcing Terms and Conditions" (Jan. 9, 2009) (Vertrue Doc. 35271-35276).

3.  Internal Webloyalty e-mail between two Webloyalty employees regarding multiple membership policy (Nov. 11, 2008) (Webloyalty Doc. 101163 - 101166).

4.  Page from Vertrue's "Customer Service Final Exam – Answer" sheet (July 15, 2008) (Vertrue Doc. 436).

5.  Internal Webloyalty e-mail between multiple Webloyalty executives including Mr. Richard Fernandes, Chief Executive Officer, concerning high credit card chargeback rates (Oct. 1, 2002) (Webloyalty Doc. 103427 and 103429).

6.  E-mail from Airtran Marketing Executive to Affinion Group Vice President regarding Airtran customer, Mr. W., who had difficulty canceling his membership and receiving a refund (Oct. 21, 2008) (Affinion Doc. AFSE-04-3396 – AFSE-04-3397).

7.  Webloyalty Document "Top Ten Reasons A Member Calls" (Feb. 2006) (Webloyalty Doc. 56370).

8.  Webloyalty Script for Consumer Calls (Webloyalty Doc. 26055-26059).

9.  Vertrue Scripted Response for Question "How Did I Get Signed Up for this???" (Vertrue Doc. 82269).