## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

_____

L.S., a minor, by P.S., his parent and next friend, )
on behalf of himself and all others similarly )
situated, )
                                   )       Case No. 3:10-cv-01372 (CSH)
            Plaintiff, )
                                     )
v. )
                                       )
WEBLOYALTY, INC., GAMESTOP )       **OCTOBER 15, 2015**
CORPORATION, and VISA INC., )
                                     )
            Defendants. )
_____ )

## RULING ON DEFENDANTS' MOTIONS TO DISMISS
## SECOND AMENDED COMPLAINT

**HAIGHT, Senior District Judge:**

Plaintiff in this case has filed a second amended complaint ("SAC") [Doc. 91]. Defendants have filed motions to dismiss the entire pleading. [Docs. 93 & 94]. Plaintiff resists those motions. This Ruling resolves them.

### I

The case had its inception in November 2009, when Plaintiff L.S., then a minor, made an internet online purchase of a video game. Plaintiff used a debit card to pay for the purchase. There is no suggestion in this energetically fought litigation that Plaintiff did not get the video game he paid for. This lawsuit arises because the transaction had an additional consequence: a monthly fee charged by a third party, ostensibly for membership in a discount and money-saving program in respect of future internet purchases.

Plaintiff challenges the legality of those monthly charges, and sues to recover them. Plaintiff also purports to sue on behalf of "all others similarly situated," by which his counsel means all persons or entities whose credit or debit cards were used in an online electronic commercial transaction with the parties defendant in the case, and were in consequence subjected to the same monthly membership fees.

The present motions seek to dismiss a second amended complaint (sometimes, "the SAC") [Doc. 91]. The Plaintiff's first amended complaint was the target of an earlier motion to dismiss by Defendants. In a Ruling reported at 2014 WL 3547640 (D.Conn. July 17, 2014) ("the July 17 Ruling"), familiarity with which is assumed, the Court granted that motion in part, with leave to the parties to conduct additional limited discovery, and leave to Plaintiff to replead his complaint. Additional discovery has been conducted, and Plaintiff has repleaded, in the form of the SAC. The July 17 Ruling recites in detail the facts and circumstances of the case, and sets forth the Court's reasoning with respect to a number of issues that arise again on the present motions. The recitations and reasoning of the July 17 Ruling are incorporated by reference into this Ruling and are not repeated here, except as necessary for clarity.

## II

Plaintiff's first amended complaint contained 14 counts, against one or another or all of the three Defendants: Webloyalty, Inc., a self-styled "online savings service"; GameStop Corp., a retail store and online merchant of electronic products; and Visa, Inc., the well-known progenitor of credit and debit cards. Those counts are summarized in the July 17 Ruling, 2014 WL 3547640, at *1. They alleged claims under federal statutes (the Electronic Communications Privacy Act and the Electronic Funds Transfer Act); Connecticut statutes (the Connecticut Unfair Trade Practices Act

and certain Connecticut general statutes); and common law claims for unjust enrichment; money had and received; negligent misrepresentation; fraud; aiding and abetting; and civil conspiracy.

The SAC contains the same 14 counts, alleged against the same defendants, as did the first amended complaint.   The two pleadings differ in the details and arrangement of the factual allegations upon which these several claims are said to be based.   The July 17 Ruling's disposition of Defendants' earlier motion to dismiss the first amended complaint is of core importance to the Court's disposition of Defendants' present motions to dismiss the second amended complaint.   It is necessary to consider the July 17 Ruling with care.

Defendants' motion to dismiss Plaintiff's first amended complaint was based on the premise that every count alleged in the pleading was a claim of fraud, either explicitly or by its inescapable nature.   Proceeding from that premise, Defendants contended that every count failed to comply with the heightened standard for pleading fraud claims contained in Fed. R. Civ. P. 9(b).[1]   Defendants sought dismissal of the entire complaint on that ground.   The July 17 Ruling noted : "Defendants say in their briefs that this [non-compliance with Rule 9(b)] requires dismissal of the entire amended complaint, since all Plaintiff's claims, however captioned, sound in fraud."   2014 WL 3547640, at *7.   Plaintiff disputed that particular proposition.

In the July 17 Ruling I said that "I will defer decision on that issue," but held that "Defendants' motion to dismiss Plaintiff's claims sounding in fraud will be granted, for failure to plead fraud with the specificity required by Rule 9(b)."   *Id*.   One could not avoid the conclusion that

---

[1]   Rule 9(b), Fed. R. Civ. P., captioned "Fraud Or Mistake; Conditions Of Mind," states, in relevant part:

> In alleging fraud or mistake, a party must state with particularity the
> circumstances constituting fraud or mistake.

*some* of Plaintiff's claims "sounded in fraud" because Count IX of the first amended complaint, against Defendants Webloyalty and Gamestop, was captioned "For Fraud."  As to those claims sounding in fraud which the July 17 Ruling dismissed for failure to comply with Rule 9(b), the Ruling granted Plaintiff leave to replead, and also granted leave for limited additional discovery within the context of possible further amendments to the complaint.  That was the course followed by District Judge Huff in the virtually identical case of *Berry v. Webloyalty.com, Inc.*, No. 10-CV-1358-H (CAB), 2010 WL 8416525 (S.D.Cal. Nov. 16, 2010), whose reasoning and result I found persuasive.  Judge Huff held that the fraud allegations in the first complaint were insufficient under Rule 9(b), granted additional discovery and leave to replead, considered the additional evidence (including the plaintiff's deposition) and an amended complaint, and in a subsequent opinion, dismissed the amended complaint and the action with prejudice.  *See* 2011 WL 1375665.[2]

I concluded the July 17 Ruling by saying:

> Within the context of Defendants' Motion to Dismiss the Amended Complaint, the parties are granted leave to conduct limited discovery into the issues identified by this Ruling.  If counsel sensibly follow the course steered by Judge Huff in *Berry*, that discovery will include the depositions of Plaintiff, Winiarski and Pipkin, as well as such additional evidentiary sources as may occur to counsel, provided that they are relevant to the issues identified in the Ruling.

---

[2]   Not surprisingly, counsel for Plaintiff L.S. in the case at bar are not happy about Judge Huff's opinions in *Berry*.  Counsel asked me to disregard them because the Ninth Circuit had vacated Judge Huff's final order and remanded the case to the District Court "with instructions to dismiss without prejudice."  I rejected counsel's request, principally because the Ninth Circuit based its ruling on a perceived lack of standing on the part of the plaintiff, without prejudice to the underlying merits.  However, I added that even if "the Ninth Circuit had reversed Judge Huff's decision on its merits (which the court of appeals took care to say it was not doing), I would be free," sitting in a different circuit, "to regard Judge Huff's reasoning as more *persuasive* than that of the court of appeals." 2014 WL 3547640, at *5.  In this Ruling, I will continue to find useful guidance in Judge Huff's *Berry* opinions, because I still regard her opinions as persuasive.

2014 WL 3547640, at *9 (emphasis omitted).  Winiarski and Pipkin are Webloyalty employees, previously identified in affidavits.

Taking Plaintiff's deposition was crucial to the continuing consideration of the case because of factors identified in the July 17 Ruling.  That Ruling said of the 14-count first amended complaint:

> Its principal contention is that the manner in which Webloyalty arranged and presented its enrollment page screenshots perpetrated a fraud upon a consumer like the child L. S., who alleges he found himself an unaware and unintentional member of a bogus rewards program which lifted $12 out of his credit card pocket every month.

2014 WL 3547640, at *6.  That initial pleading was deficient because conclusions of counsel, rather than factual allegations by Plaintiff, were the sources upon which the complaint based its descriptions of the fraudulent scheme by which Webloyalty ensnared Plaintiff.  "What Plaintiff was aware of," I wrote in the July 17 Ruling, "what he intended, what he consented to, what he authorized: these are the ultimate questions in the case."  *Id.,* at *7.  I reasoned that since "Rule 9(b) provides that a fraud plaintiff must 'state with particularity the circumstances' that constitute a fraud perpetrated by *these Defendants* upon *this Plaintiff*," it was "not sufficient for L.S. to simply to state the desired conclusions – 'I did not know, I did not intend, I did not consent, I did not authorize' – while omitting a statement of the circumstances justifying those disclaimers."  *Id.*

The July 17 Ruling also noted on this point that "Judge Huff's instructive reasoning in *Berry,* quoted *supra,* admirably summarizes the circumstances that a plaintiff in a case of this nature must state with particularity," 2014 WL 3547640, at *7.  The quotation from Judge Huff's *Berry* opinion, 2010 WL 8416525, at *5, appeared in the July 17 Ruling at *6, and it is useful to quote her language again:

> Plaintiff   does   not   identify   with   factual   specificity   the

5

misrepresentations or specific advertisement that he relied on when he entered his email address. He only states vague allegations of the coupon offer. He does not allege what the coupon stated to mislead him to think that it was a free coupon offer. He does not allege what exactly was deceiving about the way the coupon was presented to make him think it was free. He does not allege all the steps he took to sign up for the offer and does not allege what representations or omissions were made to him at each step. Accordingly, the Court grants Defendants' motion to dismiss on these counts that are grounded in fraud.

Within the past three months, another district court has analyzed the deficiencies of a comparable claim in similar fashion.  The case is *Park v. Webloyalty.com, Inc.*, No. 12-cv-1380 (LAB), 2015 WL 4560567 (S.D. Cal. June 22, 2015).   The online "membership" program implemented by Webloyalty in *Park* is the same as the one Webloyalty employed in the case at bar. District Judge Burns dismissed the initial complaint in *Park,* granted plaintiff leave to seek to remedy the pleading's deficiencies in an amended complaint, and then, in the cited opinion, rejected the proposed amendment as futile and dismissed the action with prejudice.  Judge Burns reasoned that the proposed amended complaint (the "TAC")

fails to expand on allegations the Dismissal Order pointed out were insufficient. For instance, the TAC alleges that Park never noticed certain disclosures, did not realize he had been enrolled in a membership plan, and did not notice his bank account was being charged $12.00 each month. It is true that these are necessary allegations; Park may not claim he was deceived if he actually knew what he was agreeing to. But they are not sufficient. Park must allege facts showing not only that he did not know these things, but also that the disclosures provided to him were insufficient to put him on notice. Park's failure to notice or read what was presented to him before he agreed to it does not mean he was deceived. . . .

To plead a claim, Park would need to allege facts that, if true, show he is entitled to relief, not merely that he *might* be entitled to relief. [(citing *Iqbal*, 556 U.S. at 679) (emphasis in original)]. When confronted with the possibility that he was told multiple times he was

6

> enrolling in a membership program, Park cannot simply remain silent
> or change the subject. He must plead facts showing he was not told
> those things – or if he was, why the disclosures were ineffective.

2015 WL 4560567, at *3.  Judge Burns, having analyzed  what a plaintiff must specifically allege to state a claim in a case such as this one, rejected as insufficient for that purpose the plaintiff's "generalized allegation that context could have rendered disclosures inadequate," and was equally dismissive when the plaintiff "adds his own unwarranted conclusions about the effect of those allegations and asserts Webloyalty had the intent to deceive." *Id.*, at *4.

The quoted reasoning of the district judges in *Berry* and *Park* is entirely persuasive.  I unblushingly extend that praise to my own reasoning in the July 17 Ruling, which set the stage for the deposition of Plaintiff L.S.  I turn to that deposition testimony.

### III

Attorneys from the Boston firm representing Defendants Webloyalty and GameStop took Plaintiff L.S.'s deposition on September 16, 2014.  The deposition took place in an office in Denver, Colorado.  L.S., who resides in Greenwich, Connecticut, was attending the University of Colorado at Boulder, and had returned to the University from Connecticut during the preceding month of August.  The New York attorney for Plaintiff appeared at the deposition in Denver.  The New York attorney for Defendant Visa appeared telephonically.

Counsel for the parties have not furnished to the Court the full transcript of this deposition.  Their papers on the present motion attach selected pages – some chosen by counsel for Plaintiff, others by counsel for Defendants.  I have arranged the selected pages in numerical order and read them all.  It is reasonable to believe that I have now read everything in Plaintiff's deposition testimony that any attorney for any party thinks bears upon any relevant issue in the case.  What

follows in this Part is based upon those selected portions of the deposition of Plaintiff L.S.  Citations to the deposition transcript are designated "Tr."

The appealing portrait that emerges from this deposition is one of a supportive and sensible family.  It was supportive for L.S.'s parents to furnish their 16-year-old adolescent son with a Visa debit card he could use as he chose.  It was sensible for the parents to review the monthly card statements to monitor the purchases L.S. made.  The vigilance of L.S.'s mother detected the conduct by Defendants of which complaint is made in this action.  L.S., returning to college some years later, received his copy of the second amended complaint from his father.

Counsel for Defendants Webloyalty and GameStop, who took the lead on this discovery deposition, established this background at the beginning of the deposition and then turned to the events which occurred during L.S.'s online purchase in November 2009 which gave rise to this litigation.  I will preface an analysis of L.S.'s relevant testimony on those events by recalling that in the July 17 Ruling, I introduced the case as one which involved "an asserted fee-paying membership in a discount or other benefit program generated during the course of an otherwise unrelated online purchase of a product," and added: "Typically, the consumer's membership in the program is claimed to have been created as the combined result of language appearing on the consumer's computer screen, arrows with instructions for the consumer to follow by clicking on them, requests for information from the consumer, and buttons reciting 'I accept' for the consumer to click on."  2014 WL 3547640, at *3.  I further observed in the July 17 Ruling that Judge Huff's opinion in *Berry v. Webloyalty* was a useful source of information and guidance for the present action since "the defendant marketer-programmer in *Berry* was Webloyalty, just as it is in this case, and the computer screen pop-up displays and instructions to consumers were the same in *Berry* as they are in the case

8

at bar." *Id.*, at *4.

Counsel for Defendants Webloyalty and GameStop placed a copy of the SAC before L.S., called his attention to a number of allegations in the pleading, and asked L.S. questions about them. I will quote a typical exchange:

> Q. [by Mr. Prendergast, counsel for Defendants Webloyalty and GameStop]: Let's look at Exhibit 1 [the Second Amended Complaint].  Let me ask you to turn to paragraph 58.  Paragraph 58, the first sentence reads, "Plaintiff understood that his purchase on www.gamestop.com would be safe and secure."  Do you see that?
>
> A. (Deponent [Plaintiff L.S.] nodded head up and down.)
>
> Q. Okay.  Did you have that belief in November of 2009?
>
> A. Yep.
>
> Q. Okay.  Was that belief based on any oral or written statement provided by GameStop?
>
> A. Not that I remember.
>
> Q. Was it based on anything – if not based on an oral or written statement, what was it based on?
>
> A. I've based it off of [*sic*] that I've been to GameStop before and nothing has happened out of the ordinary.
>
> Q. Anything else that you base that belief on?
>
> A. They're a very large company, and I didn't think they'd give away my information.
>
> Q. Okay.  And did anybody at GameStop tell you that they would not give away your information?
>
> A. No.
>
> Q. Did you ever see anything written by GameStop that said they would not give away your information?

A. Not that I remember.

Tr. 48-49.[3]

Plaintiff gave comparable testimony with respect to several other allegations in the SAC about what he understood or believed at the time of his November 2009 online transaction with GameStop. The focus of defense counsel's questioning at the deposition then turned to a key document in the case: the so-called "Enrollment Page," a graphic reproduction on paper of a display that appeared on L.S.'s computer screen during the transaction. The Enrollment Page (whose name describes its intended function) referred to the "Shopper Discounts and Rewards" plan, which L.S. accepted by clicking on the "Yes!" button at the bottom of the Enrollment Page, thereby planting (in a manner this teen-age electronic consumer could not have foreseen) the acorn from which this towering litigation tree eventually grew.[4]

The case for Defendants is that the Enrollment Page's factually accurate descriptions of the discounts and reward plan, including the $12 monthly fee to be charged against a participating consumer's credit or debit card, when coupled with the consumer's option to reject plan participation

---

[3]  At Tr. 48 line 25, counsel for Plaintiff voiced an objection to one of these questions, but Plaintiff was allowed to answer, and the objection is not pressed on this motion.

[4]  The Enrollment Page makes numerous appearances throughout the case. It made an early entrance as Exhibit A to the November 1, 2010 Declaration of Richard Winiarski, a Webloyalty marketing officer [Doc. 17-4]. The Enrollment Page was marked Exhibit 14 at the deposition of L.S. The Enrollment Page was created by Defendant Webloyalty. A consumer like L.S. was led to it by clicking on a "Continue" button on a page created by Defendant GameStop, after the electronic purchase of a GameStop product had been completed. The "Continue" button is accompanied by the statement that "By clicking above, you can claim your incentive from our preferred partner when you join their service." "Preferred partner" is the phrase GameStop used in the pertinent displays to describe Webloyalty, also immodestly described by Webloyalty itself in the Enrollment Page as "the premier online savings service." *See* January 8, 2015 Declaration of Meghan L. Pipkin [Doc. 94-2] at ¶ 5.

by simply clicking on the "No thanks, not right now" line displayed on the screen, combine to preclude any claim that L.S.'s signing up for the plan by clicking on the "Yes!" button was procured by fraud.[5]

While during his deposition Plaintiff was questioned at length about the contents of the Enrollment Page and his reactions to them, Plaintiff's testimony sheds no light one way or the other on this aspect of the case.  Defendants' Brief [Doc. 94-1] at 18 accurately summarizes that testimony: "Plaintiff himself is unable to say that anything on the Enrollment Page caused him to hold the beliefs that the Second Amended complaint ascribes to him, because, as he admits, he simply does not remember what the page looked like."  I will not quote the relevant testimony at length; the following portions, which are typical, suffice:

> Q. [by Mr. Prendergast] Mr. Slyne, have you ever seen Exhibit 14 [the Enrollment Page] before?
>
> A.  Ever or –
>
> Q. Ever.

---

[5]    Plaintiff contends in his Opposing Brief [Doc. 100] at 36-38 that the Court should not consider the Enrollment Page and internal Webloyalty-generated documents on these motions because they have not been sufficiently authenticated.  This is a reprise of a contention the July 17 Ruling rejected, 2014 WL 3547640 at *8.  That Ruling considered declarations by Meghan Pipkin and Richard Winiarski, Webloyalty employees, which attached a printout of the  Enrollment Page and other documents "that they declare, again on sufficient knowledge, constitute copies of documents generated and created by activity in Plaintiff's own account."  The July 17 Ruling denied Plaintiff's motion to strike those documents.  Webloyalty offers the Enrollment Page and other documents again on the present motions, introduced by a further declaration from Pipkin [Doc. 94-2] and a declaration from Donald Gustavson [Doc. 94-6], an equally knowledgeable declarant (Winiarski having left the company's employ).  In addition, Pipkin's deposition was taken on September 7, 2014.  I am satisfied now, as I was in preparing the July 17 Ruling, that the documents in question are relevant (the Enrollment Page is of obvious core importance) and the accompanying declarations are sufficient to "support a finding that the item is what the proponent claims it is."  Fed. R. Evid. 901(a).  Plaintiff's renewed effort to persuade the Court to disregard this evidence fares no better than his first.

A. Ever?

Q. [by Mr. Prendergast, after colloquy between counsel] Go ahead and answer.

A. I don't think so.

Tr. 59-60.

Q. [by Mr. Prendergast] Do you believe today that there was a "Continue" button on the GameStop Web pages?

. . .

A. I do not remember.

Q. You don't remember?

A. I don't remember.

Tr. 83.

The deposition of Plaintiff and related additional discovery having been accomplished, the question presented on this aspect of the case is whether Plaintiff's claims sounding in fraud, as pleaded in his Second Amended Complaint, survive Defendants' renewed motions to dismiss those claims under Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure.

**IV**

The Second Circuit has said recently, in *Financial Guaranty Insurance Company v. Putnam Advisory Company, LLC*, 783 F.3d 395 (2d Cir. 2015): "A claim for common law fraud is subject to the particularity pleading requirements of Federal Rule of Civil Procedure 9(b), which requires that the plaintiff (1) detail the statements (or omissions) that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent."  783 F.3d at 402-03 (citation and internal

quotation marks omitted).

These heightened pleading standards apply to L.S.'s claims against the Defendants at bar, to the extent that those claims are grounded in fraud. In *Berry v. Webloyalty.com, Inc.,* No. 10–CV–1358–H (CAB), 2011 WL 1375665 (S.D.Cal. April 11, 2011), which involved the same principal defendant and online discount plan as does the case at bar, Judge Huff applied the Rule 9(b) standards "to the following causes of action that are grounded in fraud: (1) negligent misrepresentation, (2) fraudulent misrepresentation," and claims for (3) "false advertising" and (4) "unfair competition" under California statutes. 2011 WL 1375665, at *3. I agree with Judge Huff's reasoning with respect to these common law claims, and begin this analysis by applying the Rule 9(b) standards to Plaintiff's Counts VII and VIII (negligent misrepresentation) and to Count IX (fraud).

While the submissions of Plaintiff's counsel condemn Defendants' conduct with an articulate intensity bordering on passion, I find myself unable to discern in the recently enhanced record either pleadings or proof sufficient to satisfy the heightened standards for fraud claims imposed by Rule 9(b) and summarized by the Second Circuit in a case like *Financial Guaranty*.[6]

Rule 9(b) and *Financial Guaranty* require the Plaintiff to plead and prove *in detail* the statements or omissions said to be fraudulent, who spoke them, when and where the statements or omissions were made, and why the statements were fraudulent. L.S. is the only individual who can give admissible evidence about those factors. The underlying transaction in this case occurred when

---

[6] There are many Second Circuit opinions summarizing in like fashion the Rule 9(b) pleading requirements for fraud claims. *See, e.g., Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of New York,* 375 F.3d 168, 187 (2d Cir. 2004), and *Harsco Corp. v. Segui*, 91 F.3d 337, 347 (2d Cir. 1996).

L.S. clicked on the "Yes" button at the bottom of the computer-screen displayed Enrollment Page. Only L.S. is in a position to testify about how he understood the statements on the Page *at the time of the transaction* and why he believes they were fraudulent.[7] L.S.'s vigilant mother questioned him about the Webloyalty $12 charge when it appeared on the debit card statement; his attentive father gave him a copy of the SAC as L.S. returned to the University of Colorado. Neither parent can testify as to the Rule 9(b) factual elements the Second Circuit deems essential to a fraud claim; only their son, a teenager at the time of the transaction, can do so. On the Plaintiff's side of the case, there must be evidence from L.S. on these core issues, or there will be none. That is the consequence of the parents' trusting their adolescent child with a debit card, a trust which speaks well of this family's structure and spirit, but like all acts has consequences.

In *Berry,* another action against Webloyalty, Judge Huff concluded that a particular disclosure appearing on an identical Enrollment Page "is sufficient to place reasonable consumers on notice that they are entering into the Shopper Discounts & Rewards Club and that they are accepting the offer by clicking on the 'YES' button." 2011 WL 1375665, at *4. "In addition," Judge Huff went on to say, the Enrollment Page "has five other disclosures that inform the consumer

---

[7] I stress the phrase "at the time of the transaction" because the Second Circuit in *Financial Guaranty*, in addition to the factors quoted in text, also said that to state a viable fraud claim, a plaintiff's complaint must include "the fifth element, causation," which is to say, whether a defendant's fraudulent statement or omission "caused injury to the plaintiff." 783 F.3d at 402. "To satisfy that element, a plaintiff must allege both that the defendant's misrepresentation induced plaintiff to engage in the transaction in question (transaction causation) and that the misrepresentation directly caused the loss about which plaintiff complains (loss causation)." *Id.* (citations and internal quotation marks omitted). The Defendants' motions to dismiss the case at bar do not contend that Plaintiff's allegations of causation are insufficient, and I do not reach that question. However, the fifth element of causation is worth noting for present purposes, because it emphasizes that the underlying claim of fraud turns upon the declarations, understandings and states of mind of the participants in the transaction at the time of the transaction.

that by choosing to join the club, the consumer will be charged $12 a month after an initial free thirty-day trial.  The enrollment page also discloses three times that if the consumer chooses to enroll in the club, the consumer's credit or debit card information would be transferred from MovieTickets.com [the vendor analogous to GameStop in the case at bar] to Webloyalty and would be charged the monthly charge."  *Id.* (citation omitted).

These circumstances in *Berry* are the same as those in the case at bar, and also in *Park*, another action against Webloyalty, where Judge Burns said in dismissing the third amended complaint:

> When confronted with the possibility that he was told multiple times he was enrolling in a membership program, Park cannot simply remain silent or change the subject. He must plead facts showing he was not told those things – or if he was, why the disclosures were ineffective. If the proffered web pages are consistent with the complaint and yet adequately and properly disclose the nature of the transaction, the complaint is inadequate. Park was told this, and the TAC [third amended complaint] should have pleaded facts showing that those exhibits could not be authentic – or, in other words, that he was not given the disclosures Webloyalty says he was given. In order to state a claim, the complaint would need to exclude the possibility that those exhibits are what Webloyalty claims they are.

2015 WL 4560567, at *3.

Upon examining the deposition testimony of L.S., the present Plaintiff, one is struck by L.S.'s virtual silence about the factual issues which Rule 9(b) and Second Circuit case law deem essential to a viable fraud claim.  The deposition transcript consists of 84 pages (its length somewhat extended by running exchanges of verbal small-arms fire between counsel).  Mr. Prendergast, counsel for Webloyalty and GameSport, asked almost all the questions put to Plaintiff during the course of a discovery deposition noticed by Defendants.  Mr. Eisenstein, counsel for Visa, participated

telephonically, asked L.S. one question, repeated it in slightly different form, and declared himself satisfied.  Tr. 72.  The witness was then tendered to Mr. Katz, counsel for Plaintiff, who said "I just have a couple of questions. . . . This will just take a second."  Tr. 72-73.  The questions Mr. Katz asked and the answers L.S. are not included in the pages submitted by the parties on these motions, but they could not have been extensive; Mr. Prendergast, who had resumed questioning at some point unrevealed by the submitted pages, was able to say as soon as  Tr. 83, line 22-23: "Okay.  Then I have no further questions."  Mr. Katz said: "I have nothing to follow up."  Tr. 83, line 24.  Mr. Eisenstein said: "Nothing else here."  Tr. 84.  The deposition concluded.

The  striking  aspect  of  L.S.'s  testimony  is  that  nowhere  does  he  identify  a  statement  or statements,  among  the  several  included  in  the  Enrollment  Page,  which  L.S.  regards  as  false  or misleading, and upon which he relied in joining the discount and rewards plan by clicking on the "Yes" button: an action which, had L.S. been defrauded, he would not have taken if the identified statements had not been fraudulent.  In short:  If the viability of Plaintiff's fraud claim depends upon Plaintiff's deposition testimony, there is a near-total failure of proof on essential elements upon which Plaintiff bears the burden of proof, if he is to succeed on the claim.

The second amended complaint attempts to avoid this gap in the proof by allegations that (1) attribute to Plaintiff L.S. relevant beliefs, expectations or states of mind; (2) describe in detail the Defendants' allegedly fraudulent manner of conducting the discount and rewards plan; and (3) call attention to a May 2010 report of the U.S. Senate Commerce Committee which, following a factual investigation, criticized as deceptive the consumer membership enrollment plans utilized by Webloyalty and others, criticism that led to remedial legislation.

These allegations, separately or in combination, do not suffice to cure the failure of proof that

16

is revealed by L.S.'s deposition.  The case turns upon whether the conduct of Defendants Webloyalty, GameStop, and Visa, or any of them, on November 27, 2009 worked a fraud upon Plaintiff L.S. during the course of his online purchase on that date.  To sustain that claim of fraud, Rule 9(b) and Second Circuit authority require Plaintiff to plead and prove the particular circumstances described *supra*.  That proof must be found, if it is found at all, in the testimony of L.S., the allegedly defrauded victim and plaintiff.  Attacks upon a defendant or its witnesses cannot substitute for proof a plaintiff is required to make to sustain his burden.  In *Bose Corporation  v. Consumers Union of United States*, 466 U.S. 485, 512 (1984), the Supreme Court said: "When the testimony of a witness is not believed, the trier of fact may simply disregard it.  Normally the discredited testimony is not considered a sufficient basis for drawing a contrary conclusion."  For that proposition the Court cited *Moore v. Chesapeake & Ohio R. Co.*, 340 U.S. 573, 575 (1951).

    *Moore* involved the death of a railroad employee who fell from and was struck by a moving train.  Plaintiff's theory of negligence was that the train engineer made a sudden and unexpected stop without warning, thereby causing the employee to fall from the engine tender and into the path of the train.  The engineer was the only witness to the accident.  Called to testify by plaintiff, the engineer testified that he saw the decedent fall from the tender and that he made an emergency stop in an unsuccessful attempt to avoid injuring him.  Plaintiff argued at trial that owing to certain other circumstances, "the jury was entitled to disbelieve the engineer's version" and to accept the plaintiff's.  340 U.S. at 576.  The jury rendered a verdict for the plaintiff, the district judge granted a defense motion for judgment n.o.v., the Fourth Circuit affirmed, and the Supreme Court affirmed the court of appeals.  It is instructive to consider the Court's reasoning:

        True, it is the jury's function to credit or discredit all or part of the

17

testimony.  But disbelief of the engineer's testimony would not supply a want of proof.  Nor would the possibility alone that the jury might disbelieve the engineer's version make the case submissible to it.

The burden was upon petitioner to prove that decedent fell after the train stopped without warning, which was the act of negligence she charged. . . . [A]ll the evidence shows is that decedent fell before the train stopped.  If one does not believe the engineer's testimony that he stopped after – indeed, because of – the fall, then there is no evidence as to when decedent fell.  There would still be a failure of proof.

To sustain petitioner, one would have to infer from no evidence at all that the train stopped where and when it did for no purpose at all, contrary to all good railroading practice, prior to the time decedent fell, and then infer that decedent fell because the train stopped. This would be speculation run riot. Speculation cannot supply the place of proof.

*Id*. at 576-78 (citations omitted).

While one would not mistake a 20th century railroad accident for a 21st century website online purchase, *Moore* is instructive in the case at bar because the Court's decision exemplifies the application of broader principles.  To sustain his claim of fraud, L.S. has the burden of showing which statements ascribable to a particular defendant were fraudulent, the respects in which they were fraudulent, and the manner in which a defendant's false or misleading statements caused L.S., his online purchase having been completed, to click on the "YES" button at the bottom of the Enrollment Page displayed on his computer screen.  That burden is analogous to the *Moore* plaintiff's burden of proving that the unfortunate railroad employee was caused to fall into the path of the train by the engineer's sudden stop.  L.S.'s deposition testimony contains no evidence to show any of these elements.  That is not surprising, since at his deposition L.S. was showed a copy of the Enrollment Page (where the challenged statements were set forth) and could not recall having seen it before.

18

L.S. was also unable to identify any statement by any Defendant that he relied upon and subsequently concluded was false or misleading.  It follows that the SAC's repeated allegations of the manner in which the Enrollment Page statements deceived and misled L.S. is basically an exercise in advocacy, not a summary of what admissible evidence will show.  The SAC is, in effect, an extended presentation by counsel that given the much criticized manner in which  the Defendants set up and implemented the discount and rewards plan – "scheme," as the pleading invariably refers to it – L.S. *must* have been defrauded.  This is speculation: plausible, perhaps even informed, but speculation nonetheless, not proof that L.S. *was* in fact defrauded.  The distinction is crucial because the Court reminds us in *Moore* that speculation cannot take the place of proof.

The evidence of Defendants' internal documents in the record shows that L.S. did indeed click on the "YES" button on the Enrollment Page at the end of his November 27, 2009 visit to the GameStop website.  On that date he was listed as enrolled in the Webloyalty discount and reward plan, which would have occurred only if L.S. clicked on the "Yes" button.  L.S. accordingly authorized (in accordance with the disclosures made on the Enrollment Page) the $12 monthly charges against his card of which complaint is now made.  There is no evidence about whether L.S. noticed these disclosures at the time or what he thought about them, since at his deposition he could not remember having ever seen the Enrollment Page at all.  It is to the credit of L.S., who presents himself throughout the deposition as an intelligent and articulate young man, that he did not embroider or expand upon  his testimony and attempt to supply some of the particulars of fraudulent inducement by a defendant that  the governing law requires.  But whether L.S. read and considered these statements is not dispositive.  The *Park* and *Berry* cases involve the same Webloyalty discount and reward plan, and online consumer plaintiffs similarly situated to L.S.  In *Park*, Judge Burns said:

The disclosures Park agrees he was given were prominent, clear, made repeatedly, and placed where they were likely to be seen by anyone signing up for the program. They made clear he would be charged for the continuing membership, and disclosed that he was dealing with an entity other than Gamestop, which undercuts his claim that he was harmed by the use of the "data pass" process or that it was unfair to him. Although the Court's previous order addressed all these points, it bears repeating that Park's allegation that he did not notice or read them forms only part of a claim; it is not by itself sufficient to state a claim. If the disclosures were made, and were adequate to put Park on notice of the nature of the transaction – and the Court holds they were – the fact that he did not read or pay attention to them does not give rise to a claim.

2015 WL 4560567, at *4.  As Judge Burns had noted earlier in his opinion:

Park must allege facts showing not only that he did not know these things, but also that the disclosures provided to him were insufficient to put him on notice. Park's failure to notice or read what was presented to him before he agreed to it does not mean he was deceived.

*Id*., at *3.

*In re Vistaprint*, MDL No. 4:08-md-1994, 2009 WL 2884727, at *6 (S.D. Tex. Aug. 31, 2009) is to the same effect ("A consumer cannot decline to read clear and easily understandable terms that are provided on the same webpage in close proximity to the location where the consumer indicates his agreement to those terms and then claim that the webpage, which the consumer has failed to read, is deceptive.").[8]

In *Berry*, another action against Webloyalty with a similarly situated consumer plaintiff, Judge Huff said in dismissing an amended complaint:

---

[8]    *Aff'd sub. nom. Bott v. VistaPrint USA, Inc.*, 392 F. App'x 327 (5th Cir. 2010) (*per curiam*).

> After the disclosures were presented to him, Plaintiff Berry took three affirmative steps to accept the terms of the club membership – he entered his email twice and clicked the "YES" button. Right below the yes button, he could have clicked "No thanks" to refuse membership. The disclosures combined with affirmative steps for acceptance are sufficient that, as a matter of law, the webpage is not deceptive. Accordingly, the Court GRANTS Defendants' motion to dismiss Plaintiff's misrepresentation claims.

2011 WL 1375665, at *5 (citation, internal quotation marks, and parentheses omitted).  During the course of her analysis on this point, Judge Huff cited and quoted *Vistaprint*.

While these district court opinions from a different circuit are not binding upon this Court, *Berry* and *Park* were both brought against Webloyalty, and they arose out of facts virtually identical to those in this case.  The trial judges' reasoning in *Berry* and *Park* seem to me entirely persuasive. The able briefs of counsel cite a myriad of federal appellate and district court cases from several circuits.  It would seem that this sort of fee-charging membership club arrangement, attendant upon an online purchase transaction, is a fertile ground for litigation.  It may not be possible to reconcile all these cases with each other.  However, the conclusion this Court reaches in this case follows from familiar and well-established principles of law.

I conclude that in order to succeed against these Defendants on a claim sounding in fraud, it is incumbent upon Plaintiff to plead and prove that the disclosures, representations and statements presented to him on the Enrollment Page were false or materially misleading, *and* had the causative effect of deceiving L.S. into accepting enrollment in the Webloyalty membership program.  It is apparent from L.S.'s deposition and other evidence in the record that he does not and cannot make that necessary proof.  The fraud-related claims in the case at bar will be dismissed, as were the

comparable claims in *Park* and *Berry*.[9]

V

The consequence of the conclusions reached in Part IV of this Ruling is that Plaintiff L.S. cannot prove that the consent he gave to the terms and conditions of the discount and award plan by clicking on the "YES" button was induced by fraud on the part of the Defendants. It follows that Plaintiff must be regarded in law as having authorized the Defendants to act in accordance with those terms and conditions. It remains to consider the effect of that conclusion upon the other counts in the second amended complaint.

With one exception, this conclusion of authorization precludes all the other claims asserted

---

[9]    The second amended complaint, as did its predecessors, makes prominent mention of and quotes at length the Senate Commerce Committee's 2010 investigative report. The report contains scathing criticisms of the conduct of Webloyalty and other companies, including the sort of discount and rewards plan Webloyalty fashioned in the case at bar. Every plaintiff's attorney in every case of this nature tells the district judge about the Commerce Committee's report and gives the judge a copy to read, on the premise that the report's contents may be judicially noticed under Fed. R. Evid. 201(b). Every judge has responded in the manner I did in the July 17 Ruling: "I take judicial notice of the fact that the staff issued the report. I take no notice of, and give no evidentiary value to, the findings of the report, such as those just quoted." 2014 WL 3547640, at *2.

The issuance of the Commerce Committee report and the resulting remedial legislation illustrate the difference between the legislative and judicial branches of government. If citizens convince the Congress that identified entities are subjecting the public at large to unfair and wrongful loss, Congress can enact remedial legislation. That is apparently what happened in the world of fee-charging membership clubs attendant upon an internet online purchase transaction, of which Webloyalty was a prominent figure. The Commerce Committee's report is captioned: "Aggressive Sales Tactics on the Internet and their Impact on American Consumers." Perhaps senior Webloyalty executives, having read the Committee's criticism of their conduct, were visited at 3:00 a.m. by those unwanted inner doubts about our rectitude that come to us all on occasion. But judges are not legislators (as we are frequently reminded). Our function is not to fashion remedies to benefit the general public. Rather, we preside over fact-intensive cases, where a particular plaintiff undertakes to prove that the specific conduct of an identified defendant gives rise to a viable claim under the governing law. For the reasons stated in text, the plaintiff in the case at bar cannot prove a viable claim sounding in fraud.

in the SAC.  Those additional claims do not bear the label "fraud" or "misrepresentation," but each depends upon the presence of deceit, or unjust behavior, or wrongdoing of some sort, sufficient to vitiate the disclosures to and consent given by Plaintiff found in the record.

Thus, Count One alleges that Webloyalty and GameStop violated the Electronic Communications Privacy Act, 18 U.S.C. § 2510, when they "intentionally intercepted and/or procured by interception" Plaintiff's electronic communications "without Plaintiff's . . . knowledge, authorization or consent."  SAC ¶ 139.  In *Berry*, on facts indistinguishable from those at bar, Judge Huff held:

> The Court concludes that Plaintiff Berry's entry of his email address twice and clicking on "YES" constitutes authorization given the several disclosures made on the enrollment page.  Through this authorization, Plaintiff Berry "agree[d] to the Office and Billing Details and authorize[d] MovieTickets.com to securely transfer my name, address and credit or debit card information to Shopper Discounts & Rewards for billing and benefit processing." Accordingly, there is no interception under the EPCA.

2011 WL 1375665, at *8 (citation omitted).  The documentation and mechanics in the case at bar were the same as in *Berry.*  I agree with Judge Huff's conclusion.

Count Two of the SAC alleges that Webloyalty violated the Electronic Funds Transfer Act ("EFTA"), 15 U.S.C. § 1693, "by charging or debiting Plaintiff's . . . account" without Plaintiff's "knowledge, consent or permission," thereby committing "unauthorized electronic funds transfers" within the meaning of 15 U.S.C. § 1693(a)(12).[10]  SAC ¶ 146.  Within the body of Count Two,

---

[10]  Plaintiff refers to 15 U.S.C. § 1693a(11) with respect to "unauthorized electronic funds transfers."  SAC ¶¶ 146, 153.  Following amendment of 15 U.S.C. § 1693a on July 21, 2010 (effective July 21, 2011), the current statutory subsection  that defines an "unauthorized electronic funds transfer" is § 1693a(12).  The language of the definition remains the same.

Plaintiff also alleges that Webloyalty "failed to provide Plaintiff a signed copy of the purported pre-authorized fund transfer." SAC ¶ 148. That is a separate and discrete alleged violation of the statute. I discuss it in Part VI, *supra.*

Congress's purpose in enacting the EFTA was "to provide a basic framework establishing the rights, liabilities, and responsibilities of participants in electronic fund and remittance transfer systems." 15 U.S.C. § 1693(b). The statute acknowledges the existence of a "preauthorized electronic fund transfer," which is defined to mean "an electronic fund transfer authorized in advance to recur at substantially regular intervals." § 1693a(10). The electronic funds transfers at issue in this case are the $12 monthly charges Webloyalty made against Plaintiff's debit card, pursuant to the previously described communications at the time of the November 2009 GameStop purchase. The SAC alleges that these were "unauthorized electronic fund transfers" under § 1693a(12). That subsection provides in pertinent part:

> the term "unauthorized electronic fund transfer" means an electronic fund transfer from a consumer's account initiated by a person other than the consumer without actual authority to initiate such transfer and from which the consumer receives no benefit, but the term does not include any electronic fund transfer (A) initiated by a person other than the consumer who was furnished with the card, code, or other means of access to such consumer's account by such consumer, unless the consumer has notified the financial institution involved that transfers by such other person are no longer authorized . . .

In *Berry,* Judge Huff was required to consider an identical claim on indistinguishable facts. She held that "Plaintiff Berry's entry of his email address twice and clicking on the 'YES' constitutes authorization given the various disclosures made on the enrollment page." 2011 WL 1375665, at *7. In consequence, the charges Webloyalty made against L.S.'s debit card were *authorized*

24

electronic fund transfers sanctioned by § 1693a(10), rather than *unauthorized* electronic fund transfers condemned by § 1693a(12).  I reach the same conclusion in the case at bar, and will dismiss Count Two.  The same result applies to Count Three, which alleges an EFTA § 1693a(12) claim against Defendant Visa.[11]

The additional counts in the SAC do not survive the failure of Plaintiff's fraud claim and the consequent conclusion of authorization.  The counts as pleaded in the first amended complaint are summarized in the July 17 Ruling, 2014 WL3547640 at *1, and are replicated in the SAC.  Counts IV through XIV are a collection of common law and Connecticut statutory claims, each proceeding from Plaintiff's core claim that the Defendants (principally Webloyalty) fraudulently induced the authorization which Plaintiff clearly gave by clicking on the "YES" button and related acts of acquiescence.   The respective theories of these counts are unjust enrichment; civil theft; money had and received; negligent misrepresentation; fraud; unfair or deceptive acts or practices; aiding and abetting; and civil conspiracy.  In *Berry* Judge Huff, having concluded that the plaintiff consumer gave his authorization to be enrolled in Webloyalty's discount and rewards plan, gave that as the basis for dismissing his claims for civil theft, unjust enrichment, money had and received, and conversion, 2011 WL 1375665, at *8-9:  a conclusion compelled by the nature of the claims.  I reach the same conclusion in the case at bar, where the proof, expanded by the recent discovery, demonstrates L.S.'s authorization as a matter of law.

## VI

Plaintiff's remaining claim is based upon this provision of the EFTA: "A preauthorized electronic fund transfer from a consumer's account may be authorized by the consumer only in

---

[11] *See* n.10, *supra*.

writing, and a copy of such authorization shall be provided to the consumer when made." 15 U.S.C. § 1693e.  The regulations promulgated pursuant to the statute's authority state the provision somewhat differently: "[p]reauthorized electronic fund transfers from a consumer's account may be authorized only by a writing signed or similarly authenticated by the consumer.  The person that obtains the authorization shall provide a copy to the consumer."  12 C.F.R. § 205.10(b).  Unlike the other counts in the SAC, this claim does not depend upon fraudulent conduct on the part of a defendant.  Accordingly the Court considers it separately.

Plaintiff alleges in the SAC at ¶ 5 that during the checkout process of a consumer's online purchase of a GameStop item, Webloyalty "arranged with GameStop to insert an interstitial page" containing blanks in which the consumer was asked to type in his e-mail address and last four digits of his credit or debit card number (in the case at bar, L.S.'s Visa number).  The "interstitial page" to which the pleading refers is in fact the Enrollment Page previously described, whose completion by L.S. at the conclusion of the transaction in question is proclaimed by Defendant Webloyalty to constitute the authorization by Plaintiff which precludes his claims.  Webloyalty disputes the characterization by Plaintiff of this computer screen display as an "interstitial page." Meghan Pipkin, the Webloyalty employee familiar with the online operation, testified at her deposition that "an interstitial page is put inside a transaction, so it actually appears in the same window."  By ths definition, Pipkin explained, Webloyalty's offer to L.S. was not an *interstitial* page because L.S. had completed his GameStop order before the Enrollment Page was displayed to him.  Pipkin testified: "Q.  Was there anything left for the plaintiff to do on the GameStop page to complete his order before moving on to the Webloyalty enrollment page?  A.  No."  Tr. 104.23-105.2.

The quarrel is interesting, but more semantic than substantive.  However the Enrollment Page

is characterized, Plaintiff's theory of statutory liability on this aspect of the case is that Webloyalty was required to send L.S. a reproduction of the Enrollment Page itself: nothing else. Thus ¶ 9 of the SAC alleges: "Though Webloyalty claims that the Plaintiff entered his email address and last four digits of his debit card number on the interstitial page, it has never provided the Plaintiff, or the Court, with a signed copy of that purported pre-authorized fund transfer. . . . Webloyalty's failure to ever provide Plaintiff with a signed copy of the purported pre-authorized fund transfer is a clear violation of the legal requirements established in EFTA." That theory is reprised in ¶¶ 147 and 148 of the SAC, forming part of Count II, which allege: "The payee of a pre-authorized fund transfer is required to provide the payer a signed copy of the pre-authorized fund transfer when made. 15 U.S.C. § 1693e(a). Webloyalty failed to provide the Plaintiff a signed copy of the purported pre-authorized fund transfer. As such, Webloyalty violated 15 U.S.C. § 1693e(a)."

Webloyalty responds to this charge of a statutory violation by arguing that Plaintiff exalts form over substance. Webloyalty contends: "What matters for EFTA purposes is disclosure of the substantive billing terms, as opposed to the form in which the disclosure is provided." Reply Brief [Doc. 102] at 10. In that regard, Webloyalty establishes through the declaration of Meghan Pipkin [Doc. 53-3] that immediately following L.S.'s execution of the Enrollment Page by typing in his e-mail address and his final Visa card four numbers, Webloyalty presented to L.S. online an "Acknowledgment Page" which set forth the terms and conditions of L.S.'s enrollment in the plan, including the $12 monthly charges to his debit card. Webloyalty also emailed to L.S. on that day (November 27, 2009) a "Join Email" setting forth the same terms, conditions and charges.

I am satisfied by Pipkin's evidence (sworn declarations and deposition) that these accounts are accurate. The briefs of counsel debate at length whether (as Webloyalty contends) under the

27

statutory and regulatory scheme these contemporaneous recitations to L.S. of the terms and conditions of the Enrollment Page constitute compliance with EFTA's mandate that "a copy of such authorization shall be provided to the consumer when made"; or whether (as Plaintiff contends) the plain wording of the statute required that Webloyalty send a copy of the Enrollment Page itself to L.S.

Plaintiff's briefs do not cite any case supporting their statutory interpretation. In contrast, Defendants rely again on Judge Huff's opinion in *Berry*. On indistinguishable facts, Judge Huff rejected the plaintiff's claim that Webloyalty had violated EFTA. She reasoned:

> The Court concludes that Plaintiff Berry's entry of his email address twice and clicking on "YES" constitutes authorization given the various disclosures made on the enrollment page. . . . Furthermore, Webloyalty argues that it provided Plaintiff Berry with confirmation of the authorization through the on-screen acknowledgment page and sending him the join email. Both the acknowledgment and join email reiterated Plaintiff Berry's membership in the program, the terms and conditions of the program, and that $12 would be charged to the credit /debit card entered.
>
> Accordingly, the Court grants Defendant's motion to dismiss Plaintiff's EFTA claim.

2011 WL 1375665, at *7-8 (citations omitted).

It does not unequivocally appear from the opinion in *Berry* that the plaintiff placed explicit reliance upon the "copy of such authorization" provision in § 1693e(a). But Judge Huff may well have rejected that particular theory; and I think it clear from her analysis that she would have rejected the argument if made. In any event, I must deal with the case before me, and I conclude that the EFTA does not mandate Plaintiff's narrow construction of § 1693e(a). The Act's declaration of congressional purposes concludes with the sentence: "The primary objective of this subchapter,

28

however, is the provision of individual consumer rights." 15 U.S.C. § 1693(b).  The discernible "individual consumer right" protected by § 1693e(a) is a consumer's right to receive a contemporaneous copy of the terms and conditions of a preauthorized electronic fund transfer he has authorized from his account.  That is precisely what Webloyalty accomplished in the displayed Acknowledgment Page and the Join Email (the more significant communication which it created as a document to which Plaintiff could refer for future reference).  The statutory regulations promulgated by the Federal Reserve Board state with respect to § 1693e(a) that a payee such as Webloyalty "may comply with the requirements of this section in various ways."  Plaintiff argues that this language, intended to broaden forms of statutory compliance, should itself be narrowly construed as to preclude the ways employed by Webloyalty in this case.   The argument is unappealing and I decline to accept it.

It would be an entirely different case if Webloyalty had contented itself with Plaintiff's entries on the Enrollment Page as a preauthorization of electronic fund transfers and embarked upon monthly transfers, with no further communication to Plaintiff.  However, on the same day as the Plaintiff's online acceptance of the Enrollment Plan, Webloyalty displayed the Acknowledgment Page and e-mailed Plaintiff the Join Email notice.   These additional and contemporaneous communications fully revealed the terms, conditions, and monthly debit card charges under the program in question.   I conclude that in these circumstances, Webloyalty complied with the requirements of EFTA, 15 U.S.C. § 1693e(a).  Plaintiff's claim of a violation of the statute will be dismissed, together with Plaintiff's claims sounding in fraud.

**VII**

For the foregoing reasons, the Defendants' motions to dismiss the Plaintiff's Second Amended Complaint [Doc. 93 & 94] are GRANTED in all respects and as to all counts pleaded therein, without leave to replead.

 The Clerk of the Court is directed to close the case.

It is SO ORDERED.

Dated:  New Haven, Connecticut
          October 15, 2015


                              _/s/Charles S. Haight, Jr._____
                              CHARLES S. HAIGHT, JR.
                              Senior United States District Judge